CLAY, Circuit Judge,
dissenting.
This case presents our Court with the question of whether certain exculpatory evidence, which we all agree was improperly kept from Petitioner’s defense team, is material to Petitioner’s culpability or punishment and can serve as the basis of a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The majority’s conclusion that the state court did not unreasonably apply clearly established federal law in finding that the evidence is not material is flawed in three principal ways: first, the majority misstates the legal standard for demonstrating Brady materiality; second, in its materiality analysis, the majority mischaracterizes the factual record in this case; and third, principally because of these two problems, the majority performs a faulty prejudice analysis, and incorrectly finds that the state court reasonably held that the suppressed evidence is not material under Brady v. Maryland. I therefore respectfully dissent.
STATEMENT OF FACTS
Petitioner William T. Montgomery was sentenced to death for the aggravated murder of Debra Ogle, and sentenced to a term of years for the murder of Cynthia Tincher. This habeas proceeding concerns a single piece of evidence that the prosecution failed to disclose, namely a police report indicating that several witnesses saw Ogle alive four days after the March 8, 1986 murders purportedly took place (the “report”). The district court found the report material, and granted Petitioner’s petition for a writ of habeas corpus, stating that “sufficient weaknesses exist ... in the State’s case, that [it] could have been undermined by the withheld police report.” Montgomery v. Bagley, 482 F.Supp.2d 919, 977 (N.D.Ohio 2007). The district court elaborated that “the State’s case was not *695 airtight and that it could have been undermined by sufficient contradictory evidence.” Id. at 976. We are charged with evaluating whether the suppressed report was in fact material, entitling Petitioner to a writ of habeas corpus.
The majority adequately recites the basic facts of this case, and it is unnecessary to repeat those here. Rather, my description of the facts will be limited to those insufficiently developed by the majority, and will be interspersed throughout the analysis.
DISCUSSION
I. Legal Framework
a. Brady v. Maryland
The Supreme Court held in Brady “that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” Strickler v. Greene, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (quoting Brady, 373 U.S. at 87, 83 S.Ct. 1194). Thus, to establish a Brady violation, Petitioner must demonstrate that the evidence in question: (1) is “favorable to the accused, either because it is exculpatory, or because it is impeaching;” (2) was “suppressed by the State, either willfully or inadvertently;” and (3) was “material.” Id. at 281-82, 119 S.Ct. 1936. Because in this case the Respondent concedes that the report was exculpatory, and that the state suppressed it, the report’s materiality is the only issue in the instant appeal.
The Supreme Court has explained that favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.... [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant’s acquittal.
Kyles v. Whitley, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); see also Strickler, 527 U.S. at 280, 119 S.Ct. 1936. In so explaining, the Supreme Court reasoned that the
touchstone of materiality is a “reasonable probability” of a different result, and that adjective is important. The question is not whether [a] defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A “reasonable probability” of a different result is accordingly shown when the government’s evidentiary suppression undermines confidence in the outcome of the trial.
Id. at 434, 115 S.Ct. 1555 (internal quotations and citations omitted).
Furthermore, the Supreme Court indicated that “[o]ne does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Id. at 435, 115 S.Ct. 1555. We have similarly reiterated that “[t]he question [for Brady materiality is] not whether it [is] likely that [the defendant’s] conviction would be overturned in light of newly discovered evidence.” Jamison v. Collins, 291 F.3d 380, 388-89 (6th Cir.2002). Therefore, in assessing materiality under Brady, we consider “the withheld information ... in light of the evidence available for trial that supports the petitioner’s conviction.” Jells v. Mitchell, 538 F.3d 478, 502 (6th Cir.2008).
*696 Nevertheless, the test for Brady materiality “is not a sufficiency of evidence test.” Kyles, 514 U.S. at 434, 115 S.Ct. 1555. As the Supreme Court explained,
A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.
Id. at 434-35, 115 S.Ct. 1555. The Supreme Court has thus clarified that Brady materiality is not a strictly quantitative inquiry. Rather, it is more of a qualitative inquiry in which a reviewing court must ask whether the suppressed evidence casts sufficient doubt on a petitioner’s conviction that it puts the case in “a different light.” Id. at 435, 115 S.Ct. 1555.
The relevant question for the instant Brady materiality analysis, therefore, is not whether the report necessarily exculpates Petitioner, or discounts so much of the incriminating evidence that Petitioner’s conviction beyond a reasonable doubt cannot stand; rather, it is whether, after considering the relative strength and relevance of the inculpatory and exculpatory evidence, including the report, Petitioner’s conviction is “worthy of confidence.” Jells, 538 F.3d at 502 (quoting Kyles, 514 U.S. at 434, 115 S.Ct. 1555).
b. Standard of Review
Petitioner filed his petition for a writ of habeas corpus in 2000, after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act (“AED-PA”) amendments to 28 U.S.C. § 2254. Thus, because we are reviewing Petitioner’s Brady materiality claim in the context of his petition for a writ of habeas corpus, this case does not turn on a direct application of the Brady materiality standard. Rather, we must evaluate the state court’s application of Brady to Petitioner’s case through AEDPA’s deferential lens. Our disposition of Petitioner’s habeas claim hinges on the interplay between Brady and AEDPA.
As amended, section 2254(d) states:
[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
28 U.S.C. § 2254(d). A decision is “contrary to ... clearly established federal law” pursuant to § 2254(d)(1) if “the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts.” Lundgren v. Mitchell, 440 F.3d 754, 762 (6th Cir.2006) (quoting Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). A state court decision “involve[s] an unreasonable application of clearly established federal law” pursuant to § 2254(d)(1) if
the state court identifies the correct governing legal principle but unreasonably *697 applies that principle to the facts of the prisoner’s case. Clearly established Federal law, as determined by the Supreme Court of the United States, refers to the holdings, as opposed to the dicta, of the Supreme Court’s decisions as of the time of the relevant state-court decision.
Id. at 763 (quoting Williams, 529 U.S. at 412, 120 S.Ct. 1495).
The Supreme Court recently decided a series of cases clarifying AEDPA’s contours. See, e.g., Cullen v. Pinholster, 563 U.S. -, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011); Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011); Premo v. Moore, 562 U.S. -, 131 S.Ct. 733, 739, 178 L.Ed.2d 649 (2011); Renico v. Lett, 559 U.S. -, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010). This case is the first opportunity our en banc Court has had to apply AED-PA subsequent to the Supreme Court’s most recent decisions. In these cases, the Court explained that while AEDPA always requires habeas courts to accord state court decisions significant deference, the nature of the deference is tailored to the legal rule underlying the habeas claim. See Harrington, 131 S.Ct. at 786. (“Evaluating whether a rule application [by a state court] was unreasonable requires considering the rule’s specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.”).
These cases dealt with application of general rules, specifically, evaluating whether counsel provided ineffective assistance, and determining whether the trial court properly declared a mistrial. See, e.g., Cullen, 131 S.Ct. at 1403; Harrington, 131 S.Ct. at 788 (“[t]he Strickland standard is a general one, so the range of reasonable applications is substantial”); Premo, 131 S.Ct. at 740; see also Renico, 130 S.Ct. at 1865 (“the standard applied ... [namely,] whether the [trial] judge exercised sound discretion [in declaring a mistrial] — is a general one, to which there is no plainly correct or incorrect answer in this case”). A habeas court considering alleged violations of those general rules is reviewing two layers of discretionary action: (1) those of the initial actor — either counsel, or the state trial court; and (2) the state court’s evaluation of the constitutional reasonableness of that conduct. See, e.g., id. at 1864.
Although the Supreme Court has not had occasion to describe AEDPA’s application in the Brady context at issue in this case, by considering Brady with reference to the legal rules which the Supreme Court has reviewed under AEDPA, we can extrapolate how to apply AEDPA in the Brady context.
In contrast to the circumstances in which the Supreme Court recently applied AEDPA, Brady is a narrow rule that mandates specific compliance with its requirements, and does not involve discretion in its implementation. Brady requires that a reviewing court reverse a conviction or sentence if a prosecutor suppresses exculpatory or impeachment evidence that is material to a defendant’s guilt or sentence. See Strickler, 527 U.S. at 280, 119 S.Ct. 1936; Brady, 373 U.S. at 87, 83 S.Ct. 1194. Assessing whether a Brady violation entitles a petitioner to relief does not involve a discretionary inquiry with multiple correct answers. Rather, it involves a legal determination that considers the totality of a case’s facts with reference to the excluded evidence in order to determine whether that evidence “undermines confidence in the outcome of the trial.” Kyles, 514 U.S. at 434, 115 S.Ct. 1555. The Brady standard thus affords state actors little leeway in its implementation, and cases with multiple correct answers, and multiple reasonable conclusions are bound to be far less *698 common in the context of Brady materiality than in cases assessing discretionary action. See, e.g., Cullen, 131 S.Ct. at 1407. Therefore, because the narrowness of Brady circumscribes state actors’ legitimate range of reasonable choices, as compared to discretionary state determinations, state actions implicating Brady are subject to relatively less deference on habeas review. See Harrington, 131 S.Ct. at 786 (stating that “[t]he more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations,” and explaining that this discretion is accorded a commensurate amount of deference on habeas review).
The nuances of our Brady analysis under AEDPA are guided by the recent Supreme Court cases highlighting AEDPA’s important role as “part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions.” Harrington, 131 S.Ct. at 787; see also Cullen, 131 S.Ct. at 1398; Walker, 131 S.Ct. at 1120; Premo, 131 S.Ct. at 733; Renico, 130 S.Ct. at 1855. The AEDPA standard “is a difficult to meet, and highly deferential standard for evaluating [state court] rulings, which demands that [state court] decisions be given the benefit of the doubt.” Cullen, 131 S.Ct. at 1398 (internal quotations and citations omitted). The Supreme Court has thus reiterated that “[a] state court’s determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court’s decision.” Harrington, 131 S.Ct. at 786.
Nonetheless, AEDPA does not foreclose federal habeas review of state court convictions and sentences. As the Supreme Court emphasized, AEDPA “stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.” Id. Rather, federal habeas review continues to serve the important role of “guarding] against extreme malfunctions in the state criminal justice systems,” id., and in its recent decisions the Supreme Court counseled us regarding the precise mechanics of AEDPA deference.
These cases explicating AEDPA yield several principles that guide our application of AEDPA deference to Petitioner’s claim. First, the Supreme Court stressed that a federal court must accord AEDPA deference to all state court adjudication of a claim, even those disposed of by an unexplained summary order. In according a summary order the requisite AEDPA deference, a federal court must review the case to ensure that no reasonable legal argument exists in support of the state court’s decision. In so doing, the habeas court must carefully examine the case’s factual record in its entirety, taking care not to overlook any reasonable justifications for the state court’s decision. See id. at 789-91. Second, the habeas court must not apply undue hindsight to the case, see Premo, 131 S.Ct. at 745, but must analyze the habeas claims from a contemporaneous perspective. See Harrington, 131 S.Ct. at 789.
Application of these AEDPA principles must be tailored to a case’s legal context, and further tailored to a case’s factual context. See id. at 786; Renico, 130 S.Ct. at 1864. The degree of deference mandated by AEDPA varies depending on the degree of legitimate discretion involved in the conduct under review. “When assessing whether a state court’s application of federal law is unreasonable, the range of reasonable judgment can depend in part on the nature of the relevant rule that the state court must apply.” Renico, 130 S.Ct. at 1864. The more discretion possessed by the actor whose conduct is under review on habeas, the more deference a fed *699 eral habeas court must accord the decision under AEDPA. Furthermore, “[bjecause AEDPA authorizes federal courts to grant relief only when state courts act unreasonably, it follows that the more general the rule at issue — and the greater the potential for reasonable disagreement among fair-minded judges — the more leeway state courts have in reaching outcomes in case-by-case determinations.” Id. (internal quotations, citations and emphasis omitted). Therefore, under AEDPA, “[ejvaluating whether a rule application [by a state supreme court] was unreasonable requires considering the rule’s specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.” Harrington, 131 S.Ct. at 786; see also Renico, 130 S.Ct. at 1864.
Renico, Harrington, Premo, and Cullen all applied general rules that accorded the actors under review significant discretion. Renico considered whether the state court unreasonably applied the double jeopardy clause in finding that the trial court did not abuse its discretion in granting a mistrial. The Supreme Court explained that the standard for determining “whether the judge exercised sound discretion [in declaring a mistrial] — is a general one, to which there is no plainly correct or incorrect answer.” Renico, 130 S.Ct. at 1865. Harrington, Premo, and Cullen all evaluated habeas petitions claiming ineffective assistance of trial counsel, and all turned on whether the state court unreasonably applied Strickland in determining that counsel’s representation did not fall below an objective standards of reasonableness. See Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In analyzing the reasonableness of counsel’s conduct, the Court highlighted that “[t]he Strickland standard is a general one ... [and] the range of reasonable applications is substantial.” Harrington, 131 S.Ct. at 788 (“There are ... countless ways to provide effective assistance in any given case.”). Thus, in deciding habeas petitions based on the trial court’s declaration of a mistrial, and whether counsel’s performance was deficient, in addition to the deference it accorded the state court, the Supreme Court accorded the trial court and counsel significant deference, corresponding to their significant discretion in determining their courses of action. See, e.g., id. at 786-88.
The standards discussed above are general ones that afforded the actors significant discretion, and could be satisfied through a range of potentially divergent conduct. In contrast, the Brady standard at issue in our case constitutes a narrow rule that mandates specific compliance from prosecutors. The AEDPA deference accorded the state determinations in Brady cases is thus dissimilar from the AED-PA deference accorded in Renico, Harrington, Premo, and Cullen. First, whereas those cases called for a double layer of deference, in the instant case, only a single layer of deference to the state court’s decision is required. Second, those cases involved general rules that could be reasonably applied in several divergent ways according to the actor’s discretion, accommodating multiple reasonable interpretations on review. See, e.g., Renico, 130 S.Ct. at 1865. Brady, however, imposes a straightforward disclosure requirement with fewer options for correct application, and correspondingly fewer reasonable outcomes in any given set of factual circumstances when material evidence is not disclosed. See, e.g., Kyles, 514 U.S. at 434, 115 S.Ct. 1555.
Notwithstanding the foregoing discussion, these AEDPA principles, tailored to the Brady materiality context, require that we accord the state court’s determination deference in the instant case. Therefore, we may only grant habeas if, based on the *700 facts of this case, any reasonable jurist would agree that the Brady evidence was material. As discussed below, AEDPA’s exacting standard is met in this case, entitling Petitioner to relief.
II. State Court Opinion
In adjudicating Petitioner’s Brady claim, the last reasoned decision of the Ohio state court found that Petitioner “asserted that the state wrongfully withheld exculpatory evidence that on March 12,1986 ... Debra Ogle was seen alive in the parking lot of her apartment complex by [several] witnesses who went to high school with her.” Montgomery, 482 F.Supp.2d at 976 (quoting State v. Montgomery, 1999 WL 55852, at *8, 1999 Ohio App. LEXIS 266, at *8 (Ohio Ct.App.1999)). The Ohio court concluded that “this isolated information, recorded in the course of an ongoing investigation when all of the facts were still being pieced together and in the face of overwhelming evidence presented at trial that Ogle had been killed on March 8, 1986, did not undermine confidence in the outcome of the trial.” Id.
As previously discussed, AEDPA mandates that in evaluating a petition for a writ of habeas corpus, we
consider whether the [state court’s] decision applies a rule that contradicts such law and how the decision confronts the set of facts that were before the state court. If the state[ ]court decision identifies the correct governing legal principle in existence at the time, a federal court must assess whether the decision unreasonably applies that principle to the facts of the prisoner’s case,
Cullen, 131 S.Ct. at 1399, by “determinfing] what arguments or theories supported, or ... could have supported, the state court’s decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court.” Harrington, 131 S.Ct. at 786.
In this case, in contrast to Harrington, the state court explained its basis for denying Petitioner’s habeas claim. See id. (“Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here [where the state court disposed of a claim in a summary order], could have supported the state court’s decision.”) If the state court articulated its reasons, the habeas court must identify and evaluate those reasons under § 2254(d); only if the state court did not articulate its reasons must the habeas court hypothesize as to the state court’s reasoning, and evaluate those hypothetical reasons. See id. In evaluating the state court decision in this case pursuant to AEDPA, we need not hypothesize as to the state court’s reasoning. Instead, we base our decision on the reasoning articulated by the state supreme court.
As explained by the district court, the state court stressed, in dismissing Petitioner’s Brady claim, that the report was immaterial “in the face of overwhelming evidence presented at trial that Ogle had been killed on March 8, 1986.” Montgomery, 482 F.Supp.2d at 976. This analysis constituted an unreasonable application of Supreme Court precedent. It overlooked the Supreme Court’s admonition that Brady materiality “is not a sufficiency of evidence test,” Kyles, 514 U.S. at 434, 115 S.Ct. 1555, and missed the relevant legal question under Brady and its progeny, namely, whether “the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Id. at 435, 115 S.Ct. 1555. By ignoring the nature of the evidence, and focusing entirely on the quantum of available evidence, the state court confused Brady materiality with a test for sufficiency of the evidence, *701 thus unreasonably applying the Brady materiality standard to the facts of this case.
Although the majority’s analysis attempts to explain that the state court’s dismissal of Petitioner’s Brady claim was reasonable, as discussed more fully below, the majority is unable to muster any persuasive arguments that the state court’s decision was a reasonable application of established Supreme Court precedent. When the facts of this case are assessed through the narrow Brady materiality rule, the state supreme court’s determination falls short of satisfying even the exceedingly deferential AEDPA standard of review applicable in this case. The majority’s argument, which relies on numerous factual and legal errors to reach its conclusion that the state supreme court’s decision was not an unreasonable application of federal law, does not demonstrate the contrary.
III. The Majority’s Factual Errors
Pursuant to AEDPA, we presume that the state court’s factual findings are correct absent clear and convincing evidence to the contrary. See Lundgren, 440 F.3d at 763; 28 U.S.C. § 2254(e). Our deference to the state court’s factual findings notwithstanding, a habeas court must, to some extent, grapple with a case’s relevant facts as found by the state court. See Cullen, 131 S.Ct. at 1407. Specifically, we must review the factual record before the state court in order to evaluate whether the state court unreasonably applied clearly established federal law to the facts. See id. This prerequisite is never more significant than in a Brady case where “we consider [the suppressed evidence] in light of the evidence available for trial that supports the petitioner’s conviction.” Jells, 538 F.3d at 502.
The majority implicitly acknowledges this requirement, and uses some of the facts in analyzing the report’s materiality. {See Maj. Op. at 680-81, 682-84.) But, the majority’s cursory examination of the relevant facts cannot provide an adequate basis for assessing the reasonableness of the state court’s application of Brady to the facts before it. Even considering the substantial deference that AEDPA mandates, the majority’s perfunctory review is inadequate. See Harris v. Haeberlin, 526 F.3d 903, 910 (6th Cir.2008) (“[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.”) (quoting Miller-El v. Cockrell, 537 U.S. 322, 324, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)).
Had the majority thoroughly analyzed the factual record before the state court, it would have apprehended the egregious mistakes that the state court made in denying Petitioner’s Brady claim. Instead, the majority finds that the report is not material under Brady by glossing over the veracity and credibility problems affecting several pieces of inculpatory evidence, and ignoring the Supreme Court’s directives to look at the entire case from all perspectives. See Harrington, 131 S.Ct. at 789-91. Therefore, prior to discussing the state court’s unreasonable application of clearly established Supreme Court precedent, and the majority’s equally deplorable misapplication of Brady in denying Petitioner a writ of habeas corpus, it is necessary to identify the majority’s factual missteps which handicap its ability to perform a proper AEDPA analysis of Petitioner’s Brady claim.
As an initial matter, there are several problems with the majority’s recitation of the facts. The majority recounts that “[Petitioner] had purchased a .380 caliber semi-automatic pistol and ammunition just weeks before the murders and was wearing a dark hooded jacket with the hood tied tight around his face when he entered the gun shop to purchase the pistol.” {Id. *702 at 671-72.) Although the majority represents its description of Petitioner’s apparel as established fact, this detail is not as certain as the majority implies. In her testimony during Petitioner’s trial, Trisha M. Blackburn, the salesperson working at Cleland’s Gun Shop when Petitioner purchased the gun, affirmed that Petitioner “had on a windbreaker tied closely around his face” when he came to the gun shop. (J.A. at 6114.) However, Blackburn admitted at trial that when she initially spoke with police officers she was unable to “give[] them a description of how [Petitioner] was dressed on that particular day.” (Id. at 6113-14.) Moreover, when pressed, Blackburn stated that she did not remember either what “the other customer[s] ha[d] on that” day, 9id. at 6114-15), or what she was wearing that day. (See id. at 6115.) Nor did Blackburn recall “how [any Cleland customers between March and July 1986] were dressed when they came in.” (Id. at 6118 — 19.) Nevertheless, Blackburn maintained that she “specifically recalled] what [Petitioner] was wearing on that particular day.” (Id. at 6115.) Far from being the ironclad fact represented by the majority, Blackburn’s memory of Petitioner’s dress on that date is dubious at best.
Next, the majority notes that “[Petitioner] and Tincher and Ogle were acquaintances.” (Maj. Op. at 671-72.) However, Albert Earl, Jr. testified at Petitioner’s trial that Heard was also acquainted with both victims. {See J.A. at 5886-87.) Thus, contrary to the majority’s intimation, because both Petitioner and Heard were acquainted with the victims, this fact is not probative of the culprit’s identity.
Moreover, in repeating the pertinent facts for its analysis, the majority lists the evidence implicating Petitioner as follows:
First, both victims were shot with a .380 pistol that [Petitioner] bought approximately two weeks before [Ogle’s and Tincher’s] deaths. Second, [Petitioner’s] uncle saw [Petitioner] drunk and in possession of the murder weapon only a few hours before Tincher was found shot dead approximately one-half of a mile from [Petitioner’s] home on March 8. Third, [Petitioner] admitted to being at Ogle[’s] and Tincher’s apartment on March 8, and it is undisputed that Ogle was reported missing sometime shortly after [Petitioner’s] acknowledged visit. Fourth, [Petitioner] was wearing a dark blue pin-striped suit jacket during the night in question, and a few hours after Tincher was found dead and Ogle disappeared, [Petitioner] took a dark blue pin-stripped suit to the dry cleaners that was soaking wet and that made a “brownish dripping mess on the floor” as it dried. Fifth, Heard testified that he was with [Petitioner] and witnessed [Petitioner] shoot Ogle. Sixth, on the evening of March 12, [Petitioner’s] mother delivered the murder weapon to [a police officer] at a nearby Way-Lo station. Finally, [Petitioner] showed police officers where Ogle’s body was on March 12.
(Maj. Op. at 680.)
Although the majority lists several of these facts to demonstrate Petitioner’s opportunity to commit the crimes, because Petitioner and Heard were admittedly together much of the evening, these facts are equally if not more demonstrative of Heard’s opportunity to commit the crimes. The majority states that “[Petitioner] admitted to being at Ogle[’s] and Tincher’s apartment on March 8.” {Id. at 680) However, in his testimony at Petitioner’s trial, Heard admitted that he was also present at Ogle’s and Tincher’s apartment on the night of March 8, 1986. {See J.A. at 6460-62.) Therefore, Petitioner’s presence at the victims’ apartment does not indicate that he, rather than Heard, committed the crimes.
*703 The majority further states that Petitioner’s “uncle saw [Petitioner] drunk and in possession of the murder weapon only a few hours before Tincher was found shot dead.” (Maj. Op. at 680.) First, it is noteworthy that Petitioner’s uncle, Randolph Randleman, testified that when Petitioner and Heard arrived drunk and rowdy at Randleman’s house in the early morning of March 8, Petitioner was carrying a .380 caliber semi-automatic pistol. (See J.A. at 6155-56.) However, Randleman “took [the gun] from [Petitioner, and] threw it on top of the refrigerator.” (Id. at 6156-57.) Randleman further testified that both “Heard and [Petitioner] left [Randleman’s house] out of the kitchen.... So, either one could have taken [the gun].” (Id. at 6179.) Therefore, contrary to the majority’s suggestion, Randleman’s testimony indicates that both Petitioner and Heard had the opportunity to take the gun off of the top of Randleman’s refrigerator on their way out of his house that night. However, as Randleman himself admitted, he “dfidn’t] know who took [the gun] ... [he] never s[aw] anybody take the gun----So, either [Petitioner or Heard] could have taken it.” (Id.)
Furthermore, in its factual recitation, the majority lists the following facts that were introduced at trial through Heard’s testimony:
[Petitioner] was armed with a .380 caliber pistol the morning of March 8; [a] cab took [Petitioner] and Heard to Ogle[’s] and Tincher’s apartment on Hill Avenue at [Petitioner’s] direction, where both [Petitioner] and Heard entered the apartment; Ogle was getting ready to go to work and Tincher, although she popped out to say hello, was still in bed; Ogle agreed to give [Petitioner] and Heard a ride to [Petitioner’s] mom’s apartment on Airport Road; [Petitioner,] sitting in the front seat, gave Ogle the directions and eventually told her to stop on the side of the road on Hill Avenue; Ogle and [Petitioner] got out of her car and walked roughly forty yards into a field or wooded area off Hill Avenue; Heard heard two gunshots and saw Ogle’s body laying on the ground; [Petitioner] rushed back to Ogle’s car and motioned for Heard to get in the front passenger’s seat as [Petitioner] got into the driver’s seat and drove Ogle’s car back to the victims’ apartment complex; [Petitioner] picked a gun up off the floor of the car, exited the vehicle, and told Heard to take the car; Heard then left the car and took Ogle’s wallet as he abandoned the car roughly one block from his home.
(Maj. Op. at 671-73 (internal modifications omitted).)
There are several reasons to question the credibility of Heard’s testimony.[1] Foremost, Heard had a significant motive to implicate Petitioner. Initially Heard, like Petitioner, was indicted and charged with two counts of aggravated murder that carried three death penalty specifications. However, by agreeing to testify at Petitioner’s trial, Heard was able to plead guilty to one count of complicity to murder, exposing Heard to a term of imprisonment ranging between fifteen years to life, with the possibility of parole after serving twelve and a half years of incarceration. (See J.A. at 6488-89.)
*704 Additionally, at least two pieces of physical evidence tend to implicate Heard: it is undisputed that Ogle’s car was found on the same block as Heard’s house (see id. at 6419-20); and officers testified at Petitioner’s trial that in the course of a search conducted pursuant to a valid search warrant, police officers found Ogle’s wallet in Heard’s bedroom. (Id. at 6431-32.)
There were also several discrepancies between Heard’s testimony and other evidence presented at Petitioner’s trial. Whereas Earl testified earlier in Petitioner’s trial that Heard was acquainted with both Tincher and Ogle (see id. at 5887), Heard denied having any relationship with either victim. (See id. at 6460.) Moreover, in recounting his version of Ogle’s murder on the witness stand, Heard stated that he “heard two gunshots,” after which he “look[ed] back in [Petitioner’s] direction ... and [Ogle] was lying on the ground.” (Id. at 6465.) However, in his report of Ogle’s autopsy, the coroner, Dr. Christopher Reed Desley, testified that the “main external findings” of the autopsy “were the presence of three gunshot wounds.” (Id. at 6311.) Finally, Detective Arthur M. Marx testified that Heard’s story was incredible because from Heard’s alleged vantage point, “it was physically impossible to see what [Heard] said he saw,” namely that Petitioner shot Ogle in the field. (Id. at 6556.)
The veracity of Heard’s testimony is further called into question by his concession on cross-examination that he told police several different stories relating to the crimes. (See id. at 6472-76.) “[T]he first thing he told [police was that he] didn’t know anything about it.” (Id. at 6473.) The “second thing [Heard] told [police]” was that he had “seen two white girls get killed.” (Id.) The “third thing [Heard] told police” was that he “has seen a black male ... that he knew as a dope dealer ... driving the [victim’s] car ... [d]own [an] alleyway ... [a]nd [that Heard] didn’t know who he was ... [or] what he had done with the car.” (Id. at 6474.) The fourth story Heard told police was that he “had gone to a carwash and there an unknown black male told [him] about two white girls being killed.” (Id. at 6475.) Thus, the version of the crimes that Heard recounted on the witness stand at Petitioner’s trial, and that the majority apparently credits, was his fifth story.
Heard’s testimony is therefore weak in several respects: (1) Heard had a strong motive to implicate Petitioner in order to exculpate himself; (2) it is inconsistent with several other pieces of trial evidence; and (3) Heard was proven untrustworthy, having told the authorities five versions of the facts. In its recitation of the facts, the majority does mention the credibility problems plaguing Heard’s testimony. (See Maj. Op. at 673.) However, although in analyzing the materiality of the report in conjunction with the facts presented at trial, the majority acknowledges the aspersions cast on Heard’s testimony, (see id. at 682), it ignores the probative value of this evidence. Instead, in its discussion, the majority accords significant weight to facts introduced through Heard’s testimony. This seemingly willful blindness to the weaknesses of Heard’s testimony unduly tips the scales against a finding of materiality in contravention of AEDPA’s requirement that a habeas court give comprehensive consideration to all potential factual scenarios. See Harrington, 131 S.Ct. at 789-91.
The majority makes further factual errors in its materiality analysis by surmising what may have happened had Petitioner been aware of the report at the time of his trial, and finding, based on these conjectures, that the report would not have helped Petitioner’s case. The majority states that “[Petitioner] ignores the likely *705 damaging evidence flowing from the report. Most significantly, the report ... undermines the defense theory that Heard ... was the triggerman.” (Maj. Op. at 682.) The majority also contends that the time line of events suggested by the report “entirely subverts [Petitioner’s] defense theory that Heard was the killer.” (Id. at 683.) Thus, the majority finds that the report would not have assisted Petitioner because it was not directly in line with Petitioner’s defense theory at trial. However, in unreasonably narrowing its analysis to the precise factual arguments actually presented at trial, the majority ignores the equally plausible likelihood that the report could have led Petitioner to additional information, witnesses and defense theories. Such one-sided conjecture by the majority is not a persuasive basis for finding that the report is not material.
Similarly, the majority states that [Petitioner] also ignores the fact that any witnesses who testified on his behalf regarding the alleged March 12 sighting of Ogle would have been subject to cross-examination, during which the State could have raised factual contradictions ____ [T]he State quite likely could have successfully obtained the witnesses’ admissions that they had in fact been mistaken about the sighting of Ogle and had instead seen her sister.
(Id. at 683.) However, the fact that individuals retracted their statements six years after Petitioner’s trial does not indicate that they would have done so six years earlier on the eve of Petitioner’s trial.[2] Moreover, whereas the individuals only retracted their statements six years after Petitioner’s trial concluded, they initially made the statements on March 12, 1986, just a month prior to Petitioner’s trial. Thus, if temporal proximity is any indication, it is possible that the individuals who claimed that they saw Ogle on March 12, 1986 would have stood by their account throughout Petitioner’s trial. The majority’s contention that “the State quite likely could have successfully obtained the witnesses’ admissions that they had in fact been mistaken” in stating that they saw Ogle after she was allegedly murdered, (id.), is nothing more than pure speculation. There is simply no way to evaluate whether the statements would have been retracted or undermined at Petitioner’s trial.
The majority’s analysis in this case is riddled with factual problems, which in their own right represent a failure to attempt a thorough reconstruction of the broad range of potential factual scenarios at play in the case, and thus constitutes a misapplication of AEDPA deference. See Harrington, 131 S.Ct. at 789-91. The majority also glosses over several reliability issues affecting the evidence presented at Petitioner’s trial, and makes numerous faulty factual suppositions. It is only based on this faulty factual foundation that the majority arrives at its conclusion that the report is not material.
IY. The Majority’s Legal Errors
The majority compounds its analytical problems, and wrongfully denies Petitioner a writ of habeas corpus, by misconstruing the standard for Brady materiality and applying its skewed legal framework to its unsupportable version of the facts.
*706 The majority purports to review the state court’s adjudication of Petitioner’s Brady claim to ensure that the state court did not “unreasonably appl[y] Brady to the facts of [Petitioner’s] case.” (Maj. Op. at 677.) However, under the guise of according the state court decision AEDPA deference, the majority abdicates its duty on habeas “to search for constitutional error with painstaking care,” Kyles, 514 U.S. at 422, 115 S.Ct. 1555, and rubber stamps the state court’s opinion. Thus, the majority adopts the state supreme court’s legal errors, and integrates them into its analysis of Petitioner’s Brady claim.
In formulating the requirements for Brady materiality, the majority states that
the Brady standard is not met if the petitioner shows merely a reasonable possibility that the suppressed evidence might have produced a different outcome; rather a reasonable probability is required.... In Kyles, the Supreme Court elaborated ... that Brady materiality is not a sufficiency of evidence test. Nor does Brady require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in ... a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.... [T]he obligation of a reviewing court [is] to consider the totality of the evidence — -and not merely exculpatory facts in isolation— when evaluating a claim of error for its prejudicial effect.
(Maj. Op. at 678-80 (internal citations and quotation marks omitted) (emphasis in original).) Furthermore, quoting Wong v. Belmontes, 558 U.S. -, 130 S.Ct. 383, 386, 175 L.Ed.2d 328 (2009), the majority states that
[i]n evaluating the question of prejudice, it is necessary to consider all the relevant evidence that the jury would have had before it if the defense had pursued a different path — not just the mitigation evidence the defense could have presented, but also the other evidence that almost certainly would have come in with it.
(Maj. Op. at 679 (internal modifications omitted).) Thus, according to the majority, “a reviewing court, when considering a defendant’s claim of prejudice, must evaluate the weight of mitigating and aggravating evidence regarding the defendant’s guilt, rather than simply tallying instances of mitigation.” (Id. at 679-80 (internal emphasis omitted).) After describing the facts implicating Petitioner, the majority applies this standard to conclude that because of the “considerable evidence of [Petitioner’s] guilt,” (id. at 681), the report is not material under Brady and its progeny.
The majority makes three significant missteps in its materiality formulation. First, by stating that “the Brady standard is not met if the petitioner shows merely a reasonable possibility that the suppressed evidence might have produced a different outcome; rather a reasonable probability is required,” (id. at 678), the majority distorts the meaning of “reasonable probability.” The Supreme Court has stated that the “touchstone of materiality is a ‘reasonable probability’ of a different result, and the adjective is important. The question is not whether [a] defendant would more likely than not have received a different verdict with the evidence.” Kyles, 514 U.S. at 434, 115 S.Ct. 1555. Rather, “[a] ‘reasonable probability’ of a different result is accordingly shown when the government’s evidentiary suppression undermines confidence in the outcome of the trial.” Id. at 435. Kyles contrasted “reasonable probability” with “likely” to illustrate that the materiality burden, while high, does not require a showing that disclosure of the exculpatory evidence would “likely” have produced a different result. *707 The majority, however, contrasts “probability” with “possibility,” tacitly changing the meaning of the word “probability” in the materiality context to require a likelihood of a different result for Brady materiality.
Second, although the majority recites the correct legal standard for determining Brady materiality, the majority nonetheless applies a sufficiency of the evidence standard in assessing the report’s materiality. The Supreme Court stated unequivocally in Kyles that Brady materiality “is not a sufficiency of evidence test,” and emphasized that “[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict.” Id. at 434-35, 115 S.Ct. 1555. Nevertheless, in finding that the report is immaterial, the majority lists the inculpatory evidence presented at Petitioner’s trial, and finds that the report alone does not affect the “considerable evidence of [Petitioner’s] guilt.” (Maj. Op. at 681.) The majority simply tallies up the inculpatory pieces of evidence and pits them against what it regards as the single piece of exculpatory evidence suppressed in this case, without evaluating the quality and strength of the various pieces of evidence. In so doing, the majority ignores both the qualitative nature of the Brady materiality inquiry, and the serious credibility issues undermining the evidence against Petitioner. This constitutes legal error.
Third, in an attempt to bolster its finding of immateriality, the majority asserts that the report is cumulative, and thus not material for Brady purposes, stating that “[w]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.” (Id. at 681) (quoting Byrd v. Collins, 209 F.3d 486 (6th Cir.2000).) The majority mistakes the report’s potential purpose. As discussed further below, because the case against Petitioner was significantly weaker than the majority suggests, the report casts further doubt on Petitioner’s guilt, and illuminates additional avenues that the defense could have pursued, thereby highlighting the existing difficulties with Petitioner’s conviction and sentence.[3] Thus, contrary to the majori *708 ty’s contention, the report was far from cumulative.
In finding the report cumulative, the majority also misunderstands the legal definition of cumulative evidence. Our Court has expressed frustration that “[o]ur cases ... do not tell us clearly when evidence becomes sufficiently different to no longer be ‘cumulative’ or at what level of generality one must compare the evidence.” Vasquez v. Bradshaw, 345 Fed.Appx. 104, 120 (6th Cir. 2009). However, we have most often stated that “new evidence” is not cumulative if it “differs both in strength and subject matter from the evidence actually presented at [trial].” Goodwin v. Johnson, 632 F.3d 301, 327 (6th Cir. 2011); see also Tibbetts v. Bradshaw, 633 F.3d 436, 444 (6th Cir.2011) (finding that evidence that deals with “the exact same subject” as the evidence presented at the petitioner’s trial was cumulative because “in order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way — in strength and subject matter from the evidence actually presented.... ” (internal quotation marks and citations omitted)); Landrum v. Mitchell, 625 F.3d 905, 930-32 (6th Cir.2010) (finding undisclosed evidence cumulative when “[t]rial counsel presented most of the same facts” because “[t]he petitioner must present new evidence that differs both in strength and subject matter from the evidence actually presented ... not cumulative mitigation evidence”); Beuke v. Houk, 537 F.3d 618, 645 (6th Cir.2008) (“To establish prejudice, the new evidence that a habeas petitioner presents must differ ... in strength and subject matter — from the evidence actually presented at sentencing.... evidence [that] mirrors the evidence introduced during the penalty phase” is insufficient to meet this standard); Johnson v. Bagley, 544 F.3d 592, 603 (6th Cir.2008) (finding that petitioner’s trial counsel provided ineffective assistance by failing to investigate mitigation evidence, and finding that “[c]ompetent counsel could have put on evidence that differed in ... strength and subject matter — from the evidence actually presented at sentencing” (internal quotation marks and citations omitted)); Vasquez, 345 Fed.Appx. at 120 (describing this as “our most skeptical formulation”). The degree of difference necessary for new evidence to be non-cumulative may depend on the strength of the evidence against a petitioner. See Vasquez, 345 Fed.Appx. at 120.
The report presents entirely new information, factually unrelated to any of the evidence available to Petitioner at the time of his trial, and which was untouched by the credibility problems affecting some of the trial evidence. No other piece of evidence connected with Petitioner’s case suggested that Ogle was not killed on March 8, 1986, and no other evidence came from Ogle’s high school classmates who were otherwise uninvolved with Petitioner’s trial. Particularly because of the weakness of the case against Petitioner— indeed the evidence against Petitioner was largely circumstantial with only Heard’s substantially untenable testimony directly implicating Petitioner — the report was not cumulative. See id. It is irrelevant that the report could have served a similar *709 purpose as evidence actually presented at Petitioner’s trial.
The majority opinion, therefore, commits three significant errors in its formulation of the Brady materiality inquiry. It first raises the quantum of proof required for a showing of materiality under Brady by misconstruing the meaning of “reasonable probability,” and effectively defining it as a likelihood. The majority then compounds its error by transforming its materiality inquiry into a sufficiency of the evidence test, and finds that the report is not material because it does not discount the inculpatory evidence presented at Petitioner’s trial. Third and finally, the majority hastily dismisses the report as cumulative despite the wholly new evidence it contained.
V. Application
The majority’s review of the state court’s finding that the report is not material is skewed by the majority’s misconception of the facts, as well as its misstatement of the legal standard for Brady materiality. Moreover, although the majority states that “a reviewing court, when considering a defendant’s claim of prejudice, must evaluate the weight of mitigating and aggravating evidence regarding the defendant’s guilt, rather than simply tallying instances of mitigation,” (Maj. Op. at 679-80), the majority’s prejudice analysis is in fact no more than a tally, pitting the list of facts presented at trial against the report. Based on its erroneous analysis, the majority finds that the report is not material. However, when the totality of facts in this case are evaluated under the proper legal standard, it becomes obvious that the state court unreasonably applied federal law in finding that the report is not material. It is therefore appropriate to perform a separate materiality analysis here.[4]
In a Brady materiality inquiry, a reviewing court cannot just enumerate the facts and reach a conclusion. Instead, it must evaluate any holes and weaknesses in the state’s case against a defendant and determine whether, given this totality of the evidence, inclusion of the suppressed exculpatory evidence creates a “reasonable probability” of a different outcome.
As previously discussed, the Supreme Court has clearly explained that “the touchstone of materiálity is a ‘reasonable probability’ of a different result,” Kyles, 514 U.S. at 434, 115 S.Ct. 1555, meaning that “the government’s evidentiary suppression undermines confidence in the outcome of the trial.” Id. The Brady materiality inquiry assesses the quality and strength of the evidence available during a defendant’s trial in light of the suppressed evidence. See Jamison, 291 F.3d at 388-89. Brady does not test whether the suppressed evidence left “an insufficient evidentiary basis to convict,” Kyles, 514 U.S. at 435, 115 S.Ct. 1555, but whether the suppressed evidence “could reasonably be taken to put the whole case in such a *710 different light as to undermine confidence in the verdict.” Id.
In this case, the report “undermine[s] confidence in the verdict,” compounding the already numerous holes in the prosecution’s case. The state’s case against Petitioner relied primarily on several pieces of circumstantial evidence allegedly connecting Petitioner to the crimes, and Heard’s account of Petitioner shooting Ogle. However, the probative value of several of those central pieces of circumstantial evidence is questionable.
First, a number of pieces of evidence are used to suggest that Petitioner was the man with a dark hooded jacket who was seen leaving Tincher’s car just before her body was found, (see J.A. at 6094), but each piece of evidence suffers from some significant defect. Specifically, the state presented evidence that the saleswoman at Cleland’s Gun Shop testified that Petitioner “had on a windbreaker tied closely around his face” when he came to the gun shop. (Id. at 6114). However, that same saleswoman admitted that she could not remember what any other customer before or since was wearing. (See id.) Moreover, while it is true that police officers found a dark hooded leather jacket during a search of Petitioner’s apartment, (see id. at 6362), none of the witnesses who saw the man leave Tincher’s car on the morning of March 8, 1986 could identify the jacket’s color or fabric. That Petitioner owned a black hooded jacket thus means very little in this context.
Second, the state also presented the following evidence in attempting to demonstrate Petitioner’s opportunity to commit the crimes: Petitioner was acquainted with Tincher and Ogle, (see id. at 5887); Petitioner was drunk in the early morning hours of March 8, 1986, when he arrived at Randolph Randleman’s house, (see id. at 6155, 6171); Randleman disarmed Petitioner, and placed Petitioner’s gun on the top of Randleman’s refrigerator, (see id. at 6157); Petitioner left Randleman’s residence in a taxicab, passing through Randleman’s kitchen on his way out, and could have taken the gun from the top of the refrigerator, (see id. at 6160, 6177-79); and the taxicab took Petitioner to Tincher’s and Ogle’s apartment. (See id. at 6207-10). Heard and Petitioner were, however, together the entire evening. Therefore, these facts demonstrate Heard’s opportunity to commit the crimes to at least the same extent that they demonstrate Petitioner’s opportunity.
Finally, the remaining circumstantial facts presented at Petitioner’s trial provide conflicting suggestions of guilt. Some facts tend to implicate Petitioner, while others tend to implicate Heard. These include the following: police officers found Ogle’s wallet in Heard’s bedroom, (see id. at 6431-32); Petitioner was wearing a blue pinstripe jacket on the night in question which he took to the dry cleaners “soaking wet” where “it was dripping ... a yellowish brown, brownish ... mess on the floor,” (id. at 6279-80); Ogle’s car was found near Heard’s house, (see id. at 6419-20); Petitioner was cooperative when interviewed by the police, (see id. at 6500-OS); Petitioner arranged for his mother to surrender the gun to police officers, (see id. at 6510-13, 6557); and Petitioner led police to a wooded field where police eventually found Ogle’s body. (See id. at 6544-47.) The circumstantial evidence against Petitioner presented at trial was thus weak and inconclusive.
Heard’s testimony was also a critical element of the state’s case but his testimony is riddled with credibility problems. Heard testified that Petitioner killed Ogle, ordered Heard to drop Petitioner off at Tincher’s and Ogle’s apartment so that he could kill Tincher as well, and instructed *711 Heard to take Ogle’s car. (See id. at 6463-66.)
There were three principal problems with Heard’s account. First, Heard had pled guilty to one count of complicity to murder, and in exchange for his testimony at Petitioner’s trial, avoided risking conviction for aggravated murder and the possible attendant death sentence. (See id. at 6488-89.) Heard therefore had a significant motive to testify against Petitioner. Second, Heard’s testimony was inconsistent with several other pieces of trial evidence: (1) Heard denied an acquaintance with either Ogle or Tincher, (see id. at 6460), however, Earl testified that Heard was acquainted with both Ogle and Tincher, (see id. at 5887); (2) whereas the coroner testified that Ogle’s body bore three gunshot wounds, (see id. at 6311), Heard testified that he “heard two gunshots,” (id. at 6465); and (3) Detective Arthur M. Marx testified that Heard could not have seen the crime take place in the wooded field from his alleged vantage point inside Ogle’s car which was parked on the side of the road. (See id. at 6556.) And, third, in addition to the version of the crimes he described on the witness stand, Heard told authorities four other stories regarding the crimes. (See id. at 6472-76.)
The questionable nature of the evidence against Petitioner is compounded by Officer Keefe Snyder’s testimony regarding Petitioner’s version of the events. Snyder testified that Petitioner “told [Snyder] that he was willing to talk ... to prove it was not [Petitioner] that had killed the two girls.... [Petitioner] told [Snyder] that [Petitioner and Heard] had been at [Randleman’s] house ... [Petitioner] and Glover Heard ... left the house [at] approximately 5:30 in the morning ... and were intending to go to [Petitioner’s] apartment.” (Id. at 6499.) Petitioner admitted that “he had a loaded .380 caliber pistol with him at that time. [Petitioner] stated that he had Glover Heard carry the pistol because [Petitioner] knew [there were outstanding] warrants on him and he was afraid that he would be patted down by the police.” (Id. at 6499-500.) Snyder explained that Petitioner then stated that
when he got in[to] the cab ... he had only $10. So, [Petitioner and Heard] took the cab as far as they could on the $10.... So, [Petitioner] stopped the driver and got out of the cab ... [and Petitioner and Heard] walked down to ... the apartment of Debbie Ogle and Cindy Tincher.... [Petitioner] stated that they knocked on the door, intending to get a ride from the girls to his apartment. ... Debbie Ogle answered the door. They were allowed to enter the apartment. They asked for a ride. Debbie Ogle informed them that she was getting ready for work and that she would take them.... [Petitioner and Heard] waited there in the apartment, and in the meantime, Cindy Tincher ... came out if the bedroom and said hi to them.... Cindy Tincher then returned back, into the bedroom. After [Ogle] was ready, [Petitioner], Debbie Ogle ... and Glover Heard left the apartment, leaving [Tincher] at the apartment.... [T]hey then proceeded to [Petitioner’s] apartment.... And at that time Glover Heard and Debbie Ogle dropped [Petitioner] off at ... his apartment.... When Debbie Ogle and Glover Heard dropped [Petitioner] off at [Petitioner’s] apartment ... [Heard] told [Petitioner] that he wanted to keep the gun with him, but didn’t tell [Petitioner] what for.... During the course of the [next] day, [Petitioner] statefd] that [Heard] returned his pistol. Upon checking it, [Petitioner discovered] that the clip [was] empty. And [Petitioner] stated [that] it was loaded when [Petitioner] had given it to [Heard]. [Petitioner] asked [Heard] what happened?
*712 (Id. at 6501-04.) Petitioner then equivocated, and first stated that Heard responded “you don’t even want to know.” (Id. at 6504.) However, later Petitioner told Snyder that
Heard told him, [Tincher] crossed [Heard], so [Heard] offed her.... [Petitioner] stated that Glover Heard threw [Petitioner’s] pistol, the .380. [Petitioner] ... picked up the pistol and he pulled back the slide intending to put one [bullet] into the chamber, but the pistol was empty. [Petitioner] stated that at this point Glover Heard stated, don’t even try it, and reached under the seat, [and] pulled out another pistol.
(Id. at 6507.) Later, Petitioner told Officer Larry Przeslawski that “he may be able to show [the police] where [Ogle’s] body” was because Heard had driven him past the location, bragging about the crimes. (Id. at 6391.) However, Petitioner maintained that “[Heard] was the one [who] killed both girls. [Petitioner was] only guilty of getting [Tincher] out of the apartment so [Heard] could kill her because she was the only one [who] could ... tie them in with [Ogle].” (Id. at 6397.) The veracity of Petitioner’s account, like much of the other direct evidence regarding the crimes in this ease, is questionable because Petitioner provided the police with at least two conflicting stories. (See id. at 6505.) Nevertheless, as Petitioner’s version of the facts was evidence introduced at trial, it must be accounted for in an analysis of the report’s Brady materiality.
Although the majority characterizes the evidence against Petitioner as “strong,” and “considerable,” as illustrated, it is anything but. Rather, as pointed out at Petitioner’s trial, (see id. at 6493), Petitioner’s guilt hinges upon crediting Heard’s incredible testimony against Petitioner’s equally problematic account. Even without the report, proof of Petitioner’s guilt is dubious at best.
The exculpatory evidence contained in the report casts further doubt on the state’s already weak case against Petitioner. The report “undermin[es] confidence in the verdict” against Petitioner, and thus is material. Kyles, 514 U.S. at 435, 115 S.Ct. 1555. A comprehensive review of the facts and applicable law mandates that conclusion in this case, and finding otherwise is patently unreasonable.
The majority’s contention that the report is immaterial because it undercuts Petitioner’s defense theory entirely misses the mark. The relevant question for Brady materiality is whether the suppressed evidence “put[] the whole case in such a different light as to undermine confidence in the verdict.” Id. Any conflict that the report may have with Petitioner’s defense theory notwithstanding, the report sheds light on additional potential defense theories that could have been available to Petitioner, thus further undermining the reliability of an already questionable verdict.
Only by unreasonably applying Brady, and ignoring the deeply troubling lack of proof implicating Petitioner, did the state court find that the report was not material. Only by reprising those errors can the majority deny Petitioner a writ of habeas corpus.
CONCLUSION
For the foregoing reasons, the state court unreasonably applied clearly established federal law by rejecting Petitioner’s claim under Brady v. Maryland, and we should grant Petitioner a writ of habeas corpus on that ground. Because the majority distorts the facts of this case, and misapplies Brady to find that the report is not material, I respectfully dissent.

. The Chief Judge's concurrence effectively disregards the flaws in Heard’s testimony, stating that "[djespite numerous problems with Heard's version of the murders ... what is important is that Heard sat on the witness stand and told the jury that he and Montgomery had committed the murders, that he had accepted punishment for his role, and that Montgomery had been the shooter.” (Batchelder, C.J. Con. at 688-89.) By cherry picking the facts favorable to her position, the Chief Judge oversimplifies the evidentiary complexities inherent in this case, improperly skewing her analysis against a finding of materiality.

. Although the Chief Judge’s concurrence states as fact that "[w]ithin the next couple of days,” after receiving the report, "the police knew that the report was not only implausible but just plain wrong,” (Batchelder, C.J. Con. at 686), and that the individuals who reported seeing Ogle alive on March 12, 1986, "in fact, realized that same night that they had seen Ogle’s sister and not Ogle,” (id. at 687), the Chief Judge provides no record support for these curious factual assertions.

. The Chief Judge’s concurrence contends that the report is not material because "neither the report itself nor the substance of that report could have caused a jury to have a reasonable doubt about the relevant issue here' — whether Montgomery, rather than Heard, murdered Ogle. The police report at issue here is simply immaterial to that question.” (Batchelder, C.J. Con. at 685-86.) The Chief Judge’s analysis of the Brady materiality requirement, for which no authority is cited, is excessively narrow.
The Brady materiality test, as framed by the Supreme Court, asks whether in the "absence” of the suppressed evidence, a petitioner "received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” Kyles, 514 U.S. at 434, 115 S.Ct. 1555. The Supreme Court intended to avoid limiting the materiality inquiry to asking merely, as does the concurrence, whether the suppressed evidence would likely have prevented Petitioner’s conviction under the theory of the case developed by Petitioner without the benefit of the suppressed information. See id. ("The question is not whether [a] defendant would more likely than not have received a different verdict with the evidence”). Brady draws the materiality question more broadly, asking whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Id.
Thus, for suppressed information to be material, it must constitute an important piece of evidence highly relevant to the questions of Petitioner’s guilt or punishment. In evaluating materiality, we need not, and indeed cannot, know the universe of evidentiary ramifi *708 cations that a suppressed piece of evidence could have had if timely disclosed. Rather, in assessing Brady materiality, a court’s task is to determine whether “there is a reasonable probability” that had the suppressed evidence been timely disclosed, and the petitioner’s counsel had appropriate opportunity to follow-up on the evidence, and properly use it to the petitioner’s advantage, the result of the trial might have been different. This point is lost on both the majority and the Chief Judge.

. Although the majority accuses this dissent of "undertak[ing] a de novo review of the record,” (Maj. Op. at 674 n. 1), any fair reading clarifies that this dissent is careful to apply the proper deferential standard required under AEDPA. Apparently the majority believes that only by “undertaking] a de novo review” of a claim can a federal court grant a writ of habeas corpus. See, e.g., Doody v. Ryan, 649 F.3d 986, 1003 (9th Cir. 2011) (en banc) ("Our colleagues in dissent chastise us for reaching these conclusions, accusing the majority of 'once more pay[ing] mere lip service to AEDPA and then proceeding] as though it does not exist.' The dissent would prefer that we simply parrot the findings made during the state court proceedings and call it a day. However, if we succumb to the temptation to abdicate our responsibility on habeas review, we might as well get ourselves a big, fat rubber stamp, pucker up, and kiss The Great Writ goodbye.” (internal citations omitted)).