RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0184P (6th Cir.)
File Name: 02a0184p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DERRICK JAMISON,
  *Plaintiff-Appellee/*
  *Cross-Appellant,*

  Nos. 00-3700/3760

  *v.*

TERRY COLLINS, Warden,
  *Defendant-Appellant/*
  *Cross-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 94-00175—S. Arthur Spiegel, District Judge.

Argued: January 23, 2002

Decided and Filed: May 23, 2002

Before: BOGGS, DAUGHTREY, and COLE, Circuit
Judges.

_____

**COUNSEL**

**ARGUED:** Daniel R. Ranke, ATTORNEY GENERAL
OFFICE, CAPITAL CRIMES SECTION, Cleveland, Ohio,
for Appellant. John P. Gilligan, SCHOTTENSTEIN, ZOX &
DUNN, Columbus, Ohio, for Appellee. **ON BRIEF:** Daniel

R. Ranke, ATTORNEY GENERAL OFFICE, CAPITAL CRIMES SECTION, Cleveland, Ohio, for Appellant. John P. Gilligan, William S. Lazarow, SCHOTTENSTEIN, ZOX & DUNN, Columbus, Ohio, for Appellee.

————————————

## OPINION

————————————

BOGGS, Circuit Judge. Terry Collins, Warden, appeals the grant of a petition for a writ of habeas corpus to Derrick Jamison, an Ohio prisoner sentenced to death. Jamison claims that the Cincinnati Police Department (CPD) and prosecutors suppressed exculpatory material during his trial. Jamison is not procedurally barred from advancing his suppressed-evidence claim. We are convinced that his claim is valid on the merits. We therefore affirm the grant of the writ of habeas corpus.

I

Derrick Jamison was convicted by an Ohio court of aggravated murder, and sentenced to death. Gary Mitchell was murdered August 1, 1984, at the Central Bar in downtown Cincinnati. Mitchell was found nearly dead by customers; he had received blunt-force trauma to the head, and died several days later. Several eyewitnesses saw (and gave differing accounts of) the perpetrators entering and leaving the bar. A shoe-print from a Pony gym shoe was found on the top of the bar. Police believed this crime to be one of a series, termed the Downtown Robberies.

Jamison was arrested more than two months later, on October 12, 1984, after robbing a Gold Star Chili restaurant. A hidden surveillance camera photographed him during the robbery. On his person, police found money from Gold Star Chili, jewelry from another robbery, and a gun from a third robbery. He was wearing Pony gym shoes.

In January 1985, police arrested Charles Howell, Jamison's alleged accomplice in the Central Bar murder. Howell told police that he and Jamison had robbed the bar, and that Jamison had attacked the bartender.

Prior to trial, the prosecution responded to a defense discovery request by indicating that the prosecution was aware of no exculpatory evidence. This was, however, due to the CPD's practice of "homicide booking," in which the CPD would gather inculpatory material into a homicide book that was then sent to the prosecutors; exculpatory material was excluded from the homicide book. As a result, the prosecutor never became aware of exculpatory evidence, and did not disclose it as required by *Brady v. Maryland*, 373 U.S. 83 (1963). This practice has been discontinued.

At trial, Jamison was convicted, and the jury recommended that Jamison be sentenced to death. The trial court adopted the jury's recommendation. Jamison appealed his conviction through the Ohio courts, which affirmed. A petition for certiorari to the United States Supreme Court was denied.

Jamison then filed a post-conviction petition in Ohio state court, raising ineffective assistance of counsel claims, evidentiary errors and jury issues. He did not raise the evidentiary suppression claim in the state post-conviction proceeding. The common pleas court dismissed Jamison's claims, on the grounds that they should have been proffered as part of Jamison's direct appeal. Jamison's various appeals from this decision were denied.

Jamison next filed an application in district court for a writ of habeas corpus, which contained the same claims as the state post-conviction petition. Jamison was given permission to conduct discovery as part of this proceeding. During discovery, the formerly suppressed exculpatory evidence came to light. Jamison therefore filed an amended federal habeas petition, adding the evidence-suppression claim.

The district court placed the suppressed evidence into the following categories:

(1) Evidence relating to eyewitness James Suggs who provided identification information about the perpetrators of the Central Bar robbery/homicide and who testified . . . against petitioner.

(2) Evidence relating to Charles Howell, Petitioner's co-defendant who plead guilty to aggravated robbery in connection with the Central Bar robbery/homicide and who testified . . . against petitioner.

(3) Evidence relating to the other eyewitnesses to the Central Bar robbery/homicide who provided descriptions of the two assailants.

(4) Evidence relating to other suspects for the Central Bar robbery/homicide identified by the C.P.D.

(5) Evidence relating to the cause of death of Gary Mitchell.

(6) Evidence relating to Petitioner's waiver of his Miranda rights during police questioning.

(7) Evidence relating to pretrial statements of eyewitnesses of the so-called similar robberies [including the testimony of Jo Ann Davidson] who testified at the Central Bar robbery/homicide trial.

(8) Evidence relating to other robberies investigated by the C.P.D. that occurred in the same geographical area of Cincinnati during the time Petitioner allegedly committed the so-called similar robberies that were introduced at trial.

*Jamison v. Collins*, 100 F. Supp. 2d 647, 674 (S.D. Ohio, 2000).

The district court held a cause and prejudice hearing to determine whether or not Jamison had waived his evidence suppression claim. The court found that Jamison had cause for not filing the claim. After the cause and prejudice hearing, Collins moved to have the entire Cincinnati Police Department file admitted to the record. The district court denied this addition to the record, and denied all of Jamison's claims except for the suppressed evidence claim. Jamison now appeals the denial of his rejected claims, and Collins

f.   Collectively, the Evidence was Material to Jamison's Defense.

Jamison's conviction rested primarily on three points: the testimony of Charles Howell, Jamison's co-defendant, the Pony shoe-print found on the bar, and the testimony of Jo Ann Davidson, whose positive identification of Jamison in the Sav-All robbery was considered the most damaging testimony of the trial by Jamison's trial attorney.

Applying the *Strickler* standard, we must consider whether or not Jamison would have been convicted on evidence unaffected by the *Brady* evidence. If we are convinced that a conviction would have nevertheless resulted, we must affirm. The Pony shoe evidence is left as the only primary piece of evidence uncontradicted by the *Brady* documents. The Pony shoe evidence is, alone, insufficient to produce a conviction--although Jamison was apprehended for the Gold Star Chili robbery wearing Pony shoes, these were not identical to the print found at the Central Bar scene. As the defense noted, many similar pairs of shoes had been sold in the relevant geographical area.

The evidence above, taken together, presents a significant challenge to the prosecution's theory of the case: that Howell and Jamison robbed the Central Bar on the spur of the moment, and that Jamison kicked Mitchell to death. We therefore affirm the district court's finding that the above evidence was favorable to Jamison, that it was suppressed by the prosecution, and that prejudice resulted from the suppression of the *Brady* material.

### III

For the foregoing reasons, the district court's judgment and order that petitioner be released within 120 days of the district court judgment unless the State of Ohio initiates a new trial is AFFIRMED.

seriously enough that they accompanied Suggs to several hat shops to identify the type of straw hat worn. The evidence relating to Anthony is material; although we do not hold that the state must turn over every last suspect considered in the course of an investigation, enough factors coincided with respect to Anthony that information pertaining to his arrest with the wallet and the various pieces of straw hat evidence should have been turned over.

e.    Davidson's Testimony

The CPD also did not disclose an offense report concerning Jo Ann Davidson, a victim of the Sav-All Drugstore robbery. The offense report indicated that Davidson could not identify her attacker at the time of the offense. At the Central Bar trial, Davidson identified Jamison as being the perpetrator of the Sav-All robbery. She then testified that Jamison kicked her in the face, breaking bones. This testimony was extremely damaging, given the prosecution's theory that Jamison had kicked Mitchell in the head, killing him.

The offense report could have been used to impeach Davidson's identification of Jamison at trial. Davidson did make a later identification of Jamison at a police lineup. Davidson testified to this lineup identification to bolster her in-court identification of Jamison. Upon cross-examination, Jamison attempted to undermine the lineup identification by eliciting testimony from Davidson showing that she had been unable to pick Jamison out of a photo array immediately prior to the lineup. Davidson was with other witnesses in the lineup room at the same time. If Jamison had been able to show that Davidson was unable to identify Jamison at the time of the offense, Jamison's theory that the lineup was improperly conducted, allowing Davidson to make her identification based on the reactions of other witnesses, would have carried more weight. The fact that Davidson's identification was not effectively impeached operated substantially to Jamison's disadvantage, given the extremely damaging nature of her testimony.

appeals the grant of habeas corpus with respect to the suppressed evidence claim.

II

A "federal habeas petitioner who claims he is detained pursuant to a final judgment of a state court in violation of the United States Constitution is entitled to have the federal habeas court make its own independent determination of his federal claim, without being bound by the determination on the merits of that claim reached in the state proceedings." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). The Antiterrorism and Effective Death Penalty Act of 1996 is not applicable to Jamison, whose petition was filed in 1994. *Lindh v. Murphy*, 521 U.S. 320 (1997).

A.    Elements of a *Brady* Claim

Jamison's first claim is based on *Brady v. Maryland*, 373 U.S. 83 (1963). This case and its progeny held that due process is violated when the prosecution suppresses evidence favorable to the accused in a criminal case if the evidence is material to guilt or to sentencing. *Id.* at 87. This duty extends to information in the possession of the law enforcement agency investigating the offense. *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995).

A *Brady* violation consists of three elements, as recently set forth by *Strickler v. Greene*, 527 U.S. 263 (1999). Jamison must establish (1) that the evidence was favorable to him, (2) that it was suppressed (whether intentionally or not) by the government, and (3) that prejudice ensued. *Id.* at 281-82. The prejudice (or materiality) element of a *Brady* violation is established if there is a reasonable probability of a different outcome of the trial had the *Brady* material been available. *Ibid.*

Jamison argued that he did not receive 35 documents that the prosecution should have given him during discovery prior to the 1985 trial. The documents included both directly exculpatory evidence (*e.g.*, identifications of possible suspects

other than Jamison in connection with the Central Bar robbery / murder), and information useful for the impeachment of the prosecution's key witnesses.

Jamison argued that the trial preparation practices of the CPD and the prosecutor's office caused evidence material to the defense to be suppressed. Because of these practices, the prosecutor was not aware of information not in the homicide book, and therefore did not turn that information over to the defense as was required by *Brady*. The prosecutor, Mr. Piepmeier, testified that he had relied on the homicide book, and that he would have turned exculpatory material over to the defense had he known of it.

As the district court noted, significant portions of the suppressed material were favorable to Jamison. The evidence revealed other potential suspects for the crime, provided impeachment evidence directly applicable to the most damaging testimony (that offered by Jo Ann Davidson and Charles Howell), impeached the eyewitnesses other than Howell (such as Suggs) who had placed Jamison at the scene of the crime, and offered an alternative explanation for how Mitchell died (metal pipe rather than trauma by repeated kicking) that directly opposed Howell's testimony as to how Mitchell died. The CPD homicide book practices leave no doubt that the material was originally suppressed. The only element of a *Brady* claim that remains arguable is that of materiality, which is discussed below.

## B. Procedural default

Collins claims that Jamison's *Brady* claim should not receive a merits review, as he procedurally defaulted on that claim by not first presenting it to a state court. Jamison did not raise this issue on direct appeal or state post-conviction review. The first instance of this claim was in the amended habeas petition. Jamison has defaulted unless he can be excused from application of the doctrine of procedural default.

Gene Martin, who was in the Central Bar just prior to the murder, described two black men who entered the bar--the taller one as "6' or over" and the shorter individual as 5'7". Martin told police that the two "checked out" the bar (contradicting Howell's testimony that he and Jamison had decided to rob the place on the spur of the moment). George Richardson (who lived across the street from the Central Bar) described one perpetrator as being 6'2" and the other much shorter, in the medium 5' range. Finally, Greg Mapp said that he saw a black male from 5'7" to 5'9", carrying a brass pipe, flee from the Central Bar at the time of the homicide.

Jamison considers the height descriptions important not because he does not fall near the range described for the taller perpetrator (Jamison is 6'3"), but because Howell, at 6'1", is very near his height, and not considerably shorter as described by Mapp, Hall, Martin, and Richardson for the shorter perpetrator. Because the information provided by these eyewitnesses significantly undermines Howell's testimony, we agree with the district court that this evidence was favorable and material.

### d. Evidence Regarding Other Potential Suspects

Jamison also complains that he did not receive several pieces of information, gathered during the investigation of the Central Bar murder, regarding suspects David Anthony, Robert Jordan, and Percy Tait. Jamison focuses primarily on Anthony, who was arrested carrying a wallet from one of the other Downtown Robberies. Documents revealing this arrest were not disclosed to the defense.

Anthony was also known to wear a straw hat. Evidence indicating that Anthony was a suspect was not turned over. Ellen Hall informed the police that the taller of two men that she observed entering the bar immediately prior to the murder wore a "summer hat." George Richardson told the police that the taller of the men was wearing a large, tan, straw hat; the police teletype sent out on August 1, 1984 also indicated that the taller man was wearing a "large brown straw hat in bad condition." The CPD took the eyewitness descriptions

c.    Height and Weight Eyewitness Identifications

Jamison also did not receive a number of documents containing descriptions by eyewitnesses (who did not testify at trial) describing the height, weight, skin tone, and other physical characteristics of the perpetrators. Although the statements do not by any means eliminate Jamison as the murderer, they do contradict Howell's testimony that he and Jamison committed the crime together, undermine the prosecution's theory of how Mitchell died, and indicate other possible suspects for the Central Bar murder. Jamison's defense strategy was to argue that he was not with Howell that day, and that other suspects were overlooked by the investigation; this information is, collectively, material to his defense.

The evidence essentially consists of a series of discrepancies between the physical characteristics of Jamison and Howell and the descriptions of the perpetrators of the Central Bar murder given to police investigators by eyewitnesses. The eyewitnesses involved were Greg Mapp, Ellen Hall, Gene Martin, and George Richardson. There was no way or reason for Jamison to know of their statements to police. None of the four testified at trial.

Ellen Hall, the cook at the Central Bar, described two black men who entered the bar just prior to the robbery. She described the taller of the two as stocky and approximately 6'2", wearing a summer hat. The other was 5'6" and weighed 140-150 pounds. Hall (corroborated by Suggs) told police that the taller suspect had a light complexion.[5] The description of the taller man did not fit Jamison. Jamison is taller than Howell, but has a dark complexion.

---

[5]Suggs's description is used here merely to lend credence to Hall's, since it was ruled by the district court that Suggs's description had been known to the defense at trial, and therefore was not a valid basis for a *Brady* claim.

In the Sixth Circuit, a four-part analysis is used when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). First, the court must ascertain whether there is an applicable state procedural rule. Second, the court must determine whether the state courts actually enforce the rule. Third, the court must decide whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. Finally (and the only point contested by the parties here), if the criminal defendant did not comply with the rule, the defendant must demonstrate there was cause for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional error. This "cause and prejudice" analysis is the center of the dispute between Ohio and Jamison.

In order to show cause, Jamison must provide a substantial reason for the default that is external to him. To demonstrate prejudice in the procedural default context, the petitioner must show that the alleged trial errors "not merely . . . created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). Parallel to this prejudice analysis is the question as to whether suppressed evidence is material. Satisfying the materiality requirement for *Brady* requires "a reasonable probability" that the result of the trial would have been different had the information been disclosed to the defense. *Strickler*, 527 U.S. at 288. This assessment is made by determining whether or not a jury would have convicted based on other evidence not affected by the *Brady* material. *Ibid.*

1.    Cause

Jamison argues here, as he did before the district court, that the reason he did not present his *Brady* claim earlier is that his attorneys were not given the information. This is adequate

cause for not complying with the state procedural rule, if true. The district court ruled that the *Brady* claim was not raised on direct appeal or in post-conviction proceedings in the Ohio courts; however, the district court determined that Jamison had shown cause for failing to bring the *Brady* claim in his state appeal and post-conviction proceedings because the "factual or legal basis for [the] claim was not reasonably available to counsel." *Jamison*, 100 F. Supp. 2d at 674, *citing Murray v. Carrier*, 477 U.S. 478, 488 (1986). The court pointed out that the withholding of evidence generally constitutes cause. *Amadeo v. Zant*, 486 U.S. 214, 222 (1988).

In its motion to the district court to expand the record (after the federal habeas evidentiary hearings), Ohio argued that the entire police file was inspected by the Ohio public defender (then co-counsel aiding Jamison's counsel) in 1991,[1] during the state post-conviction proceedings. Jamison's post-conviction claim was filed in June 1991, and post-conviction relief was denied in September 1991. Ohio does not state the precise date that it claims the Ohio public defender inspected the police file.

In return, Jamison asserts that cause has been established. First, he notes that the original failure to give the exculpatory evidence to the defense when requested at the state trial was clearly a *Brady* violation. In response to Jamison's discovery requests before trial, the State of Ohio's discovery statement listed "Evidence Favorable: none known." Mr. Piepmeier (one of the state prosecutors) admitted at federal habeas hearings that he would have given the exculpatory information to the defense if he had known about it.

As for Ohio's claim that the entire police record was inspected by the Ohio public defender in 1991, Jamison answers that the file, and any information concerning

---

[1] Ohio also asserts that Jamison's counsel copied the entire police file in 1996 as part of the federal habeas proceedings. However, Jamison properly amended his habeas petition to add the *Brady* violations; it is his failure to raise the *Brady* issue before the state courts that concerns us.

### a.    Suggs's Identification

Suggs, an eyewitness to the Central Bar robbery, was interviewed by the CPD. Suggs examined an photo array for the CPD and later testified for the defense that he had been unable to make a positive identification out of that array. This turned out to be incorrect. Mr. Suggs did make an identification as to the two suspects; the relevant document shows a photocopy of the array used, with a handwritten notation as to the photographs that had been picked by Suggs. These photographs were not of Jamison and Howell. The suppression of a positive identification of different suspects by an eyewitness to the crime certainly disadvantaged Jamison in conducting his defense.

### b.    Impeachment of Howell

Howell, testifying as Jamison's alleged accomplice in the robbery, was the central witness of the trial. Among the *Brady* documents were several statements by Howell to the police, which did not include Howell's dramatic testimony (given at trial) describing Jamison kicking Mitchell in the head multiple times while Mitchell begged for mercy. Jamison could not impeach this testimony without access to the prior statements. This evidence was material.

Further, eyewitness Greg Mapp gave an account to police that a black man from 5'7" to 5'9" tall pushed his way out of the Central Bar while carrying a brass pipe. This evidence would have had a twofold impact discrediting Howell's testimony. First, if Howell (who was closer to the height range suggested by Mapp) was carrying a weapon as he fled the bar, it would seem more likely that Howell was the killer. Second, if a weapon had been used in the murder, it would impeach Howell's testimony and undermine the prosecution's theory that Jamison had kicked Mitchell to death.

specific detail, nor could she identify the suspect, his accomplices, or the victim. *Id.* at 273-76. Months later, Stoltzfus confidently identified the defendant and offered other testimony regarding the abduction. *Id.* at 270.

The *Strickler* court concluded that Strickler had failed to establish the prejudice required to overcome procedural default or mount a successful *Brady* claim. The court held that the level of prejudice required was the "reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler*, 527 U.S. at 289. The question was not whether it was likely that Strickler's conviction would be overturned in light of newly discovered evidence. Instead, prejudice depended on whether "in [the suppressed evidence's] absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 289-90, *citing Kyles*, 514 U.S. at 434.

Applying the rules of *Strickler* to the instant case, the district court held that Jamison had shown that the evidence suppressed was material, and that he had therefore been prejudiced by its suppression. We now examine certain pieces of suppressed evidence for materiality.[4]

---

[4] The district court also found that some pieces of evidence upon which Jamison based his *Brady* claim were not material and therefore did not support his claim. For example, the court held that a form waiver document that Jamison alleges shows that he did not waive his Miranda rights following his arrest for the Gold Star Chili robbery was not material, because it did not refute evidence that Jamison's waiver of rights was orally given. The court also held that a number of documents had been known to the defense, and therefore cause had not been established. An investigative summary offered by James Suggs, describing the two perpetrators, was held barred (for lack of cause) except for the failure to mention that Suggs had described one of the perpetrators as wearing a straw hat. We agree with the district court's disposition of these issues.

maintenance or access to it, is not part of the record, since the district court refused Ohio's last-ditch motion to expand the record. Prior to the evidentiary hearing (for purposes of ascertaining whether *Brady* material had indeed been withheld) on July 7-9, 1999, the district court ordered the parties to file a disclosure of witnesses and exhibits to be used at the hearing. Ohio listed only the transcript of Jamison's homicide trial. Ohio did not list the collection of documents it calls the entire police file from the Central Bar murder investigation.

Throughout the hearing, Ohio did not introduce any evidence relating to the "complete file." Ohio did not offer or authenticate any police file information. After the conclusion of the evidentiary hearings,[2] the State moved to expand the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts and Rule 106 of the Federal Rules of Evidence. The district court ruled that neither Rule 7 nor Rule 106 allowed the expansion.

The purpose of Rule 7 "is to enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing." 28 U.S.C. § 2254 (Rule 7, advisory committee notes). The rule is meant to eliminate unnecessary hearings, not require the expansion of necessary ones.

Rule 106 allows a party to introduce evidence that ought, in fairness, to be considered contemporaneously with a writing or recorded statement introduced by the other party. There is "no valid basis for a per se rule that all documents contained in agglomerated files must be admitted into evidence merely because they happen to be physically stored in the same file." *United States v. Boylan*, 898 F.2d 230, 257 (1st Cir. 1990). Further, under Rule 106, the party seeking to have a document introduced for the sake of completeness must request that the new document be introduced at the time of introduction of the

---

[2] The filing date of Ohio's motion to expand the record is August 9, 1999.

allegedly incomplete document.  *See*, *e.g.*, *United States v. Larranaga*, 787 F.2d 489, 500 (10th Cir. 1986).  Jamison requested and obtained admission of entire documents.  Ohio did not object.   The only specific document that Ohio mentioned was admitted.

We review evidentiary rulings of district courts for abuse of discretion.  Although our decision might have been different, we cannot say that the district court abused its discretion in refusing to admit the police file after the evidentiary hearings.

However, we also note that *Brady*, as recently affirmed by *Strickler*, has been interpreted to impose an affirmative duty to evaluate evidence and provide exculpatory evidence to the defense.  *Kyles*, 514 U.S. at 437 (government has a duty to provide exculpatory evidence even if never requested by the defense).   Here, the defense requested all exculpatory evidence by proper pre-trial discovery request.  As the Sixth Circuit noted, "[b]ecause, as a practical matter, implementation of the *Brady* rule contemplates that the government will enjoy a measure of discretion in determining whether evidence in its possession is material, it is burdened with a corresponding duty to evaluate potential *Brady* material in a manner that will result in a fair trial."  *United States v. Hale*, No. 95-5915, 1997 U.S. App. LEXIS 1729, *6-7 (6th Cir. 1997) (unpublished).  Thus, the *Brady* violation lies not only in failing to provide the exculpatory evidence, but in failing to weigh the evidence for purposes of *Brady* disclosure.  The prosecution here could not have performed that duty, since it was intentionally kept in the dark regarding the exculpatory evidence.

Cause is shown when the factual basis of the claim was "reasonably unknown" to the defendant's counsel.  *Amadeo*, 486 U.S. at 222.  Ohio failed to evaluate the case materials for required *Brady* disclosures.   Ohio further affirmatively represented to the defense that no favorable evidence existed.  Ohio cannot now argue that it was unreasonable for defense

counsel not to have caught it suppressing evidence.[3]  Since the factual basis of the claim was reasonably unknown to defendant's counsel, we affirm the district court's judgment as to cause.

2.   Prejudice: Procedural Default and *Brady* Materiality

Prejudice, for purposes of procedural default analysis, requires a showing that the default of the claim not merely created a possibility of prejudice to the defendant, but that it worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions.  *United States v. Frady*, 456 U.S. 152, 170-71 (1982).   In *Brady* cases, procedural default prejudice analysis parallels materiality analysis under *Brady*.  *Strickler*, 527 U.S. at 282.  Therefore, following the Supreme Court's example, we proceed to a *Brady* materiality analysis.  *Ibid.*

Prejudice (or materiality) in the *Brady* context is a difficult test to meet: the Supreme Court in *Strickler* required that there must be a "reasonable probability that the jury would have returned a different verdict"; if the defendant would still have been convicted based on evidence not affected by the suppressed material, the conviction must stand.  *Strickler*, 527 U.S. at 296.

In *Strickler*, the prosecution withheld documents that discredited Anne Stoltzfus, the prosecution's star witness.  *Id.* at 270-73.  Stoltzfus testified confidently at trial, and was the sole witness to the abduction of the murder victim.  *Ibid.*  The suppressed documents showed that Stoltzfus, immediately following the incident, could not recall the encounter in

---

[3]Note that this situation is easily distinguishable from those cases that hold that no relief is required, despite a *Brady* violation by the prosecution, if the information was available to the defense via reasonable inquiry.  *See*, *e.g.*, *United States v. Bhutani*, 175 F.3d 572, 577 (7th Cir. 1999).   Where the information was readily available and official interference is not at issue, a reasonableness inquiry could conclude that defendant's counsel should have discovered the information.