DISSENT
COLE, Chief Judge,
dissenting.
Today a grim game of “prosecutor may hide, defendant must seek” plays out in the federal courts. Genesis Hill was convicted of murder and sentenced to death in Hamilton County, Ohio. At nearly every chance since, in both state and federal postconviction proceedings, Hill has maintained that the state withheld favorable evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). His claims proved prophetic: Sixteen years after Hill’s conviction, a private investigator learned that the Cincinnati Police Department, through its infamous practice of creating “homicide books,” Bies v. Sheldon, 775 F.3d 386 (6th Cir. 2014), suppressed a report which pointed to a key prosecution witness as a suspect in the murder investigation. The district court granted a conditional writ of habeas corpus. But the majority reverses, concluding that the claim is time barred, since Hill failed to come forward with the long-suppressed report at his earliest convenience. Because the rule of Brady *951 should encourage disclosure, not deception, I respectfully dissent.
I.
In Brady, the Supreme Court held that the suppression of evidence that is favorable to the accused and material to his guilt or punishment denies due process of law. 373 U.S. at 87, 83 S.Ct. 1194. “Society wins,” the Court explained, “not only when the guilty are convicted but when criminal trials are fair.” Id. For more than a half century, that rule of fundamental fairness has allowed “the search for truth” to prevail in our criminal justice system. See Strickler v. Greene, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
Hill’s claim centers on two documents that emerged during federal habeas proceedings: (i) Officer Givens’s Preliminary Investigation Report and (2) Teresa Dudley’s Grand Jury Testimony. Considering the “cumulative effect” of that suppressed evidence, see Kyles v. Whitley, 514 U.S. 419, 421, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), I am convinced that Hill was deprived of his right to a fair trial, and has satisfied the procedural prerequisites to obtaining relief in federal court. But first, a few words on the standard of review and procedural default.
A.
As the Supreme Court has made clear, federal habeas review is “sharply limited by established principles of deference.” Cone v. Bell, 556 U.S. 449, 476, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009) (Roberts, C.J., concurring in judgment). To obtain relief under the Antiterrorism and Effective Death Penalty Act of 1996 (“AED-PA”), Hill would ordinarily need to show, for instance, that the state court’s “adjudication” of his claim “involved an unreasonable application” of clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d)(1). So unreasonable in fact that the error was “well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” See Harrington v. Richter, 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011).
I remain cognizant of AEDPA’s limitations in that regard. See, e.g., Woods v. Etherton, — U.S. —, 136 S.Ct. 1149, 194 L.Ed.2d 333 (2016) (per curiam); White v. Wheeler, — U.S. —, 136 S.Ct. 456, 193 L.Ed.2d 384 (2015) (per. curiam); Rapelje v. Blackston, — U.S. —, 136 S.Ct. 388, 193 L.Ed.2d 449 (2015) (Scalia, J., dissenting from denial of certiorari); White v. Woodall, — U.S. —, 134 S.Ct. 1697, 188 L.Ed.2d 698 (2014).
But this case, the majority appears willing to concede, arises in a different posture. Ante, at 920. Section 2254(d), by its terms, can only apply to claims that have been “adjudicated on the merits in State court proceedings.” Cullen v. Pinholster, 563 U.S. 170, 186, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). And the Ohio courts did no such thing here. See State v. Hill, No. C-961052, 1997 WL 727587, at *1 (Ohio Ct. App. Nov. 21, 1997) (concluding, instead, that Hill’s Brddy claim was “barred by res judicata” becaúse it “could have been brought on direct appeal”). Federal habeas review is thus freed from the “deferential standard that applies under AEDPA,” and the merits of Hill’s Brady claim may be “reviewed de novo.” See Cone, 556 U.S. at 472, 129 S.Ct. 1769.
With that conclusion comes an attendant limitation. On direct appeal, federal courts have no authority to review decisions that “rest on adequate and independent state grounds.” Herb v. Pitcairn, 324 U.S. 117, 125, 65 S.Ct. 459, 89 L.Ed. 789 (1945). So too on collateral review: claims that have not been raised in compliance with "state procedural rules are barred in federal *952 court. Wainwright v. Sykes, 433 U.S. 72, 86-87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); see also Coleman v. Thompson, 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (noting that “[a] habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion” because “there are no state remedies any longer ‘available’ to iiim” under 28 U.S.C. § 2254(b)(1)).
Hill’s claim is, by all accounts, procedurally defaulted. The Ohio Court of Appeals concluded, in 1997, that Hill’s claims were “barred by res judicata.” Hill, 1997 WL 727587, at *1. The state has consistently argued, since at least June 1999, that Hill’s Brady claims are procedurally defaulted under Ohio law. And the district court reached the same conclusion, on the state’s motion, back in September 2006. Hill v. Mitchell, No. 1:98-CV-452, 2006 WL 2807017, at *61-66 (S.D. Ohio Sept. 27, 2006). Hill’s Brady claim is accordingly barred “absent a showing of cause and actual prejudice.” See Engle v. Isaac, 456 U.S. 107, 129, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). As the Supreme Court has recognized, however, the cause-and-prejudice standard dovetails with the elements of a meritorious Brady claim. Banks v. Dretke, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004); Strickler, 527 U.S. at 282, 119 S.Ct. 1936. So I consider those issues in tandem.
B.
This case thus presents a simple question: Did the state violate the rule of Brady? It is beyond debate that Officer Givens’s preliminary investigation report and Teresa ■ Dudley’s grand jury testimony were' suppressed by the state, and that those documents were favorable to Hill. I would also conclude that this evidence qualifies as “material” for Brady purposes.
The relevant standard has crystalized in recent years: “Evidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury.” Wearry v. Cain, — U.S. —, 136 S.Ct. 1002, 1006, 194 L.Ed.2d 78 (2016) (per curiam) (internal quotation marks omitted). A defendant need not show that he “more likely than not” would have been acquitted; only that the .suppressed, evidence could reasonably be taken to “undermine confidence” in the verdict. Id. (internal quotation marks omitted). And, by that measure, a defendant can prevail “even if ... the undisclosed information may not have affected the jury’s verdict.” Id. at 1006 n.6.
The Court has consistently recognized the value of evidence bearing on the credibility of a key prosecution witness. See, e.g., id. at 1006; Smith v, Cain, 565 U.S. 73, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012); Dretke, 540 U.S. at 700-01, 124 S.Ct. 1256; Strickler, 527 U.S. at 293-94, 119 S.Ct. 1936; United States v. Agurs, 427 U.S. 97, 112 n.21, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); Giglio v. United States, 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In Giglio, for example, the Court held that the failure to disclose a promise of immunity made to the government’s “key witness” was prejudicial because the case “depended almost entirely” on his testimony. 405 U.S. at 151, 154, 92 S.Ct. 763. Similarly, in Dretke, the Court ruled that the state’s concealment of evidence discrediting “two essential prosecution witnesses” amounted to prejudice because their testimony was the “centerpiece” of the prosecution’s case. 540 U.S. at 675, 701, 124 S.Ct. 1256. And just this term, in Wearry, the Court concluded that suppressed evidence undermining the credibility of the prosecution’s “star witness” was material because the case resembled a “house of cards” built *953 upon Ms account of the- crime. 136 S.Ct. at 1003,1006. .
This case is of a piece with Giglw and its progeny. To appreciate why, consider the facts of Hill’s trial, paying close attention to Teresa Dudley’s role as a prosecution witness and the state’s reliance on her testimony to build its case:
Domika Dudley, the six-month-old daughter of Genesis Hill and Teresa Dudley, resided with her mother’s side of the family in Cincinnati, Ohio. The teenage parents lived just down the street from each other and, despite some quarrels, appeared to have an ongoing relationship. But on May 31, 1991, just past midmght, Dudley awoke' to find her daughter missing. Officer Givens, who was the first investigator to arrive on the scene, combed the neighborhood that night to no avail. The next morning, however, Dudley found one of Domika’s barrettes on the garage floor of the Hill-family home. And the next day, after re-focusing their investigation accordingly, police discovered Domika’s lifeless body in a wooded lot nearby. The infant’s skull had been fractured. She was wrapped up in a shirt,: several plastic trash bags, and electrical tape, and then placed in an empty formula carton. State v. Hill, 75 Ohio St.3d 195, 661 N.E.2d 1068, 1072-74 (1996).
The Hamilton County Prosecutor’s Office charged Hill with aggravated -murder and sought the death penalty. See Ohio Rev. Code §§ 2903.01(B), 2929.04(A)(7). The state’s theory of the case hinged órt Hill and Dudley’s supposedly tumultuous relationship: according to the prosecution, Hill broke into Dudley’s home while she slept, kidnapped Domika undetected, murdered her, and then disposed of the body, all in a grievous attempt to avoid “pay[ing] any child support.” (Trial Tr., Vol. VII, p. 956.) But there was no smoking gun—say, a confession, or matching blood and hair samples—linking Hill to the actual killing. Rather, to demonstrate that Hill had motive to kill, access to Domika, and the implements needed to dispose of the body, the state pieced together an assortment of, as the majority puts it,-“largely circumstantial” evidence. Ante, at 934.
The most powerful testimony on that score came from Teresa Dudley, who was (in the prosecution’s words) an “essential witness.” (Id., Vol. VIII, p. 1019.) Dudley began by testifying that she had recently “got into it” with Hill over child support. (Id. at 1003.) When confronted about making those payments, Hill apparently “started going off,” said “I bet I don’t pay,” and threw a brick at Dudley’s window. (Id. at 1004-05.) The prosecution then asked Dudley to identify various pieces of physical evidence, directly linking Hill to the crime. Take, for example, -the clothing wrapped around Domika’s body. Dudley was certain that this was Hill’s shirt because she “kn[ew] him long enough to know his wardrobe.” (Id. at 1026.) The prosecution also asked her to identify Domika’s barrette. Dudley testified that she -found the distinctive clasp (it was “blue” with a “pink teddy bear” on it) “[j]ust sitting there” inside Hill’s garage. (Id. at 1013-14.) The barrette caught her eye because she “did [Domika’s] hair earlier” that evening. (Id. at 1013.) The prosecution concluded by asking Dudley to identify a picture of Do-mika’s body, ostensibly in effort to “show[ ] the barrettes and ..the shirt she identified.” (Id. at 1020.) But Dudley broke down at this sight, “became hysterical,” and started “crying very loudly.” (Id. at 1017-18.) The jury was then removed from the courtroom. Defense counsel moved for a mistrial, but the judge determined that the outburst “was [not] anything particularly out of the ordinary.” (Id. at 1019.)
Hill’s defense began—and ended—with an attempt to undermine Dudley’s credibil *954 ity. As the Ohio Supreme Court recognized, defense counsel’s strategy was to suggest that Dudley had in fact committed the crime, and Hill was the perfect patsy. See Hill, 661 N.E.2d at 1074 (“At trial, numerous ... [d]efense witnesses suggested ... that Teresa was not a good mother; that she had been aggressive towards Hill on May 31; that she had access to the trash bags in Hill’s kitchen; and that she may have ‘planted’ the barrette on the garage floor.”).
But on cross-examination, Hill’s attorney was wary of further “upset[ting]” Dudley in front of the jury. (Id. at 1025.) And more debilitating still, the defense lacked any means to seriously undermine Dudley’s account. As the proceeding ran its course, it became clear that Hill’s attorney could accomplish little beyond quibbling over minor, factual details, poking insubstantial holes in the timeline, and casting aspersions ■ on Dudley’s maternal fitness. The pi’osecution even boasted, in its closing argument, that the defense’s effort to “pin it on someone else” and “plant [a] seed of doubt in [the jurors’] minds” was rather feeble. (Id., Vol. XI, p. 1471.) Instead, the state successfully cast Dudley as Hill’s antithesis, contrasting the • father’s “remorseless]” expression with “[t]he way [the mother] reacted at the pictures of the baby.” (Id. at 1542—43.) And in the end, the jury accepted Dudley’s version of these events, convicted Hill of aggravated murder, and sentenced him to death.
No wonder the district court ruled as it did. Given this context, the court thought that the impact of the suppressed evidence on Dudley’s credibility “would have crippled the prosecution’s case against [Hill].” Hill v. Mitchell, No. 1:98-CV-452, 2012 WL 995280, at *10 (S.D. Ohio Mar. 23, 2012). I unequivocally agree. Dudley’s testimony was the thread that kept the prosecution’s case from coming apart at the seams, see Wearry, 136 S.Ct. at 1006, and she provided the “only evidence” directly tying Hill to the murder, see Smith, 132 .S.Ct. at 630.
Query, as the prosecution did during closing arguments, “[w]hat [were] the things that tie[d] the defendant into this case?” (Id. at 1543-44.) At one point, for example, the prosecution picked up the shirt that was found wrapped around Do-mika’s body and “thr[e]w the exhibit! ] [at] the defendant.” (Id. at 1544.) This piece of clothing was significant, the state explained to the jurors, because Dudley “identified ... [it] as being [Hill’s] shirt.” (Id.) The prosecution also reminded the jury that the “little barrette [was] a big deal”—only a mother would “remember what the ... barrette! ] looked like,” the state surmised, “especially if this was [her] only child” and she had “just put [it] in [the] little baby’s hair five or six hours earlier.” (Id. at 1543; id., Vol. X, at 1269-70). The relevant question, it seems, is “who tied the defendant to this case?” And the state, for good reason then, described Teresa Dudley as its “essential witness.” (Id., Vol. VIII, p. 1019.).
True, Officer Givens’s report and Dudley’s grand, jury testimony do not exonerate Hill outright. But speculation of that sort is irrelevant: one establishes Brady materiality, not through the “possibility of an acquittal,” but by “showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Kyles, 514 U.S. at 435, 115 S.Ct. 1555 (emphasis added). A defendant can prevail on a Brady claim, that is, “even if ... the undisclosed information may not have affected the jury’s verdict.” Wearry, 136 S.Ct. at 1006 n.6. .
These suppressed documents are material because they build up Hill’s defense, provide a compelling means to undermine *955 the state’s most powerful witness, and thus call into question the reliability of the jury’s verdict. Here, the preliminary-investigation report, in no roundabout way, suggests that Dudley was a potential suspect in the state’s murder investigation. According to the report, Officer Givens thought that he could “solve[ ]” the crime by “[i]nvestigat[ing] why [Dudley] ran from the police” and directed them to search “behind the house (several times).” (Givens Report, R. 219-4, PagelD 2298-99.) And the grand jury testimony shows that the discovery of Domika’s barrette, a critical event, was uncertain in Dudley’s mind: she told the grand jury she found a specific barrette outside Hill’s garage, but later told the jury at trial that she found a different barrette inside Hill’s garage. 0Compare Dudley Grand Jury Test., R. 237-1, PagelD 2598, with Trial Tr., Vol VIII, p. 1013-14.)
Would anything have changed if Dudley was thoroughly impeached in that regard? Maybe, maybe not. But whatever the ultimate evidentiary significance of those facts, the suppressed evidence is surely enough to undermine confidence in the outcome of this trial. See Kyles, 514 U.S. at 435 n.8, 115 S.Ct. 1555 (“[N]one. of the Brady cases has ever suggested that sufficiency of evidence (or insufficiency) is the touchstone.”). For the jury-was otherwise rudderless—no reason to disbelieve Dudley’s testimony, no reason to discount the weight of the remaining circumstantial evidence, and no reason to doubt that Hill kidnapped and murdered Domika. In fact, Hill’s trial attorney testified that, but for the state’s nondisclosure, he “would have conducted further investigation,” “questioned the state’s witnesses about these matters,” and could have presented a “much more effective[ ] defen[se].” (Krum-bein Aft, R. 215-12, PagelD 2237.)
What is more, the state’s remaining circumstantial evidence is not “strong enough to sustain confidence” in the capital verdict. See Smith; 132 S.Ct. at 630. The state touted various eyewitnesses at trial: for example, Barbara Sue Janson, a neighbor, testified that she saw Hill enter Dudley’s home about 10. minutes before Domika’s disappearance. But that is all she saw. Janson knew nothing of what happened inside the Dudley residence, nor did she see Hill depart. Janson further claimed that she could “positively]” identify Hill’s shirt, and that she once overheard him say “he’d kill that little bitch before” paying child support. (Trial Tr.,. Vol. 8, p. 981-82.) But it later came out that Janson had “bad blood” with the Hill family, that she only believed the shirt wrapped around Domi-ka’s body “look[ed] like” one Hill owned, and that Hill never “threatenfed] little Do-mika or ever [said] he would hurt her.” (Id. at 988, 989, 1004.) The state also mar-shalled the testimony of a local bus driver named Patrick Ormond, who apparently overheard a young man on his bus say that “he thought he might get the chair” for “what he had done to a little baby.” (Id., Vol. IX, p. 1138.) But despite that vivid recollection, Ormond could not identify Hill in the courtroom.
The prosecution also called several police officers and forensic experts to introduce circumstantial physical evidence'. For instance, the prosecution established that Hill’s latent fingerprint was on a lightbulb at Dudley’s home, and that Hill’s uncle was missing some electrical tape. The state also matched serial numbers from the formula box in which Domika’s body was found, with formula cans found inside the Hill-family home. And a forensic expert for the state opined, based on an unusual “wood grain” and “jigsaw” pattern analysis, that one of the trash bags in which Domika’s body was wrapped came from a roll inside the Hill household. (Id., Vol. IX, *956 p. 1160, 1165.) But that evidence was not unassailable. For example, Hill admitted that he went to Dudley’s house that night, but explained that he only “turned out the [light] bulb” 'as a “signal” he was “calling]” on her, then simply left when she did not respond. (M,Vol. X, p. 1413.) And the electrical tape, formula box, and trash bags were readily accessible to others, which “suggests, at most, that someone in [Hill’s family or] group of friends may have committed the crime, and that [Hill] may have been involved in events related to the murder after it occurred.” See Wearry, 136 S.Ct. at 1006. Hardly an open-and-shut capital case.
All in all, I would conclude that the suppressed evidence is sufficient to undermine confidence in the jury’s verdict, and that Hill has simultaneously established cause and prejudice- to excuse his procedural default. Because the appropriate remedy is a new trial, I would not reach Hill’s remaining claims on cross-appeal.
II.
The majority also takes issue with the timing of Hill’s amended petition. AEDPA imposes a stringent one-year limitations period on federal habeas applications. 28 U.S.C. § 2244(d)(1). But the Federal Rules of Civil Procedure create “an exception to that rule,” Cowan v. Stovall, 645 F.3d 815, 818 (6th Cir. 2011), for amended habeas petitions that “assert[ ] a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to.be set out—in the original pleading.” Fed. R. Civ. P. 15(c)(1)(B) (emphasis added).
The issue, at this crossroads, is whether Hill’s amended habeas petition “relates back” to his original petition, or whether his Brady claim is time barred. The majority opts for the latter course, ante, at 920, concluding that the district court abused its discretion in applying the relation-back doctrine. See Coe v. Bell, 161 F.3d 320, 341 (6th Cir. 1998). I cannot agree. Respectfully, the majority’s ruling is based on a mistaken reading of the Supreme Court’s decision in Mayle v. Felix, 545 U.S. 644, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005), and directly conflicts with the Eighth Circuit’s well-reasoned opinion in Mandacina v. United States, 328 F.3d 995 (8th Cir. 2003).
The law is clear. In Mayle, the Supreme Court held that Rule 15 only allows relation back when “the original and amended petitions state claims that are tied to a common core of operative facts”; not “simply because they relate to the same trial, conviction, or sentence as' a timely filed claim.” 545 U.S. at 662, 664, 125 S.Ct. 2562. To further clarify, the Court offered Man-dacina as an ideal application of the relation-back doctrine in habeas proceedings. Id. at 664 n.7, 125 S.Ct. 2562; see also Cowan, 645 F.3d at 819. There, Mandaci-na’s timely original petition “contained only generalized assertions that evidence obtained by the Gladstone Police Department was withheld,” while his untimely amended petition—“filed three years later,” as it happens—related to the suppression of a particular report favorable to his defense. Mandacina, 328 F.3d at 999, 1000 (emphasis' added). That degree of specificity was sufficient to satisfy the rationale of Rule 15, the court reasoned, because “a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide.” Id. at 1000; see also Baldwin Cty. Welcome Ctr. v. Brown, 466 U.S. 147, 149 n.3, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (per curiam). And the Supreme Court endorsed that view: “Both pleadings related to evidence obtained at the same time by the same police department,” so relation back was appropriate in the Brady *957 context. Mayle, 545 U.S. at 664 n.7, 125 S.Ct. 2562 (emphasis added).
If this fact pattern feels familiar, that is because it describes Hill’s case to a T. Hill’s first-in-time petition generally alleged that “[t]he files of the prosecutor and investigating officer” likely contain “more Brady material that it is refusing or unable to produce,” while his second-in-time petition set forth the precise details of later-uncovered evidence. (Compare Second Am. Petition, R. 137-1, PagelD 115, with Hill Am. Mot. for Recons., R. 219, PagelD 2274-82.) Both petitions (pre- and post-amendment) concerned the same “congeries of facts supporting the grounds for relief,” ie., the pre-trial suppression of evidence by the Hamilton County Prosecutor’s Office. See Mayle, 545 U.S. at 661, 125 S.Ct. 2562. To be precise, Hill’s defense counsel sought pre-trial discovery of “all information obtained during the course of [the] investigation,” and the Hamilton County Prosecutor’s Office replied that “[t]he State of Ohio knows of no evidence favorable to the defendant.” (Hill App., Vol. 1, p. A-1, A-7.) The district court rightly concluded, following Mayle and Mandacina, that Hill’s Brady claim as set forth in his motion to amend shared a common “core of operative facts” with his original petition, relation back to the date of the original petition was appropriate, and AEDPA’s statute of limitations did not bar his claim. Hill, 2012 WL 995280, at *13.
Yet the majority sees things differently. Depicting his Brady claim as “sweeping” and “vague,” the majority asserts that Hill’s original habeas petition was “completely bereft of specific fact allegations or evidentiary support and was not tied to any particular theory of relief.” Ante, at 920, 925-26. Not at all. Hill supported his Brady claim with factual allegations—from the state’s “already apparent” suppression of Teresa Dudley’s polygraph examination, to Hamilton County’s lack of “training in identifying material exculpatory evidence,” to the state’s “extensive history of Brady violations” in the Southern District of Ohio, to the state’s continued refusal to allow inspection of the prosecutor’s and investigating officer’s files. (Second Am. Petition, R. 137-1, PageID 114-16.) Hamilton County’s previous Brady violations are well documented. See Jamison v. Collins, 291 F.3d 380, 383 (6th Cir. 2002) (recognizing the Cincinnati Police Department’s “practice of ‘homicide booking”’ and describing how investigators would gather only “inculpatory material into a homicide book that was then sent' to the prosecutors”); Brief for Former Federal Judges and Prosecutors as Amici Curiae 5-8.
The majority’s anxiety is, in some sense, understandable. I too am wary of the “profound societal costs that attend the exercise of habeas jurisdiction,” Smith v. Murray, 477 U.S. 527, 539, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986), and recognize that Congress enacted AEDPA’s statute of limitations to “encourag[e] finality,” Rhines v. Weber, 544 U.S. 269, 276, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005). Even so, a petitioner’s “[d]elay by itself is not sufficient reason to deny a motion to amend,” Coe, 161 F.3d at 341-42 (internal quotation marks omitted), particularly in the Brady context, where claims “turn[] on the cumulative effect of all such evidence suppressed by the government,” see Kyles, 514 U.S. at 421, 115 S.Ct. 1555 (emphasis added); see also Mayle, 545 U.S. at 672 & n.6, 125 S.Ct. 2562 (SoUter, J., dissenting) (noting that Brady claims “like a great many others will call for examining the trial record as a whole for signs of requisite prejudice or reversible error”).
. The majority takes issue with Hill’s “failure to present the police report for *958 over three years after he discovered, it,” ante, at 925, but overlooks the cumulative nature of Brady claims and does not acknowledge that discovery was ongoing in this case. In September 2007, for instance, the district court sanctioned limited discovery on Hill’s claim that the prosecution sought the death penalty on the basis of his race. See McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). True, in December 2007, Hill obtained Officer Givens’s report through a request for information under Ohio’s Public Records Act. See Ohio Rev. Code § 149.43(B)(1). Due to the vagaries of litigation, however, the proceeding was stayed for about a year, and further delayed when the Federal Public Defender’s Office came on as lead counsel. And it was not until in September 2010 that the district court finally compelled the state to disclose all documents contained in the “prosecutor’s file.” Hill v. Mitchell, No. 1:98-CV-452, 2010 WL 3894202, at *10 (S.D. Ohio Sept. 30, 2010). For three years, then, the state managed to avoid production. But as soon as discovery was complete, and Hill felt that the cumulative effect of all Brady evidence could be fleshed out, he moved for reconsideration.
The. majority’s true concern, it seems, is that any given prisoner could include a “catch-all Brady claim” in his original ha-beas petition and, if suppressed evidence “eventually turns up,” then wait “five, ten, or even twenty years to present” it to the district court. Ante, at 925. One struggles to imagine a scenario where this parade of horribles would come to pass. (Prisoners routinely assert, and courts routinely dismiss, foolhardy Brady claims. But why would a prisoner sit on an actionable claim for 20 years?) Nevertheless, the majority’s reasoning goes so far afield as to give new meaning to the words “conduct, transaction, or occurrence” in Rule 15: a Brady claim must now set forth, “specifically, [what] the State was suppressing and how it would have benefitted [the petitioner] at trial had it been disclosed,” in order for the relation-back doctrine to ever apply. Ante, at 924. And that is the case even though, at the time of filing, a habeas petitioner will have limited access to the state’s records, and favorable evidence will often remain hidden from sight. This cannot be the balance the Supreme Court meant to strike, in Mayle, when it held that Rule 15 “relaxes, but does not obliterate, the statute of limitations.” 545 U.S. at 659, 125 S.Ct. 2562.
The majority ultimately concedes that Hamilton County’s “consistent history of suppressing evidence” gave Hill a “color-able basis” to assert his Brady claim; that the state is in no position to “invoke equitable principles”; and that Hill could not have spelled out the minutia of his Brady claim “based on the undiscovered police report or grand jury testimony in his original habeas petition.” Ante, at 925, 952. For all that, the majority merely expresses “disapproval” of the state’s decades-long deception, and disclaims the idea that it is “condoning the State’s actions in suppressing evidence favorable to Genesis Hill.” Ante, at 952. I fear the opposite is true. The willingness of federal judges to turn a “blind eye,” will likewise incentivize “prosecutors to avert their gaze from exculpatory evidence, secure in the belief that, if it turns up after the defendant has been convicted, judges will dismiss the Brady violations as immaterial,” or worse, on procedural grounds. See United States v. Olsen, 737 F.3d 625, 633 (9th Cir. 2013) (Kozinski, J., dissenting from denial of rehearing-en banc).
[[Image here]]
Because the state’s “dishonest conduct” and “unwarranted concealment should attract no judicial approbation,” see Dretke, *959 540 U.S. at 696, 124 S.Ct. 1256, I respectfully dissent.